739 A.2d 548 (1999)
In re R.D.
Appeal of R.D., Appellant,
City of Philadelphia Law Department, Party.
Superior Court of Pennsylvania.
Argued April 13, 1999.
Filed September 10, 1999.
*550 L. Roy Zipris, Philadelphia, for appellant.
Jonathan J. Houlon, Asst. City Sol., Philadelphia, for City of Philadelphia Law Dept., participating party.
Before CAVANAUGH, JOHNSON and TAMILIA, JJ.
*549 CAVANAUGH, J.:
¶ 1 R.D. appeals the trial court's order denying her petition for review of a commitment order entered pursuant to section 303 of the Mental Health Procedures Act[1], extending her confinement to a mental health facility for an additional twenty days. R.D. challenges the portion of section 303(c) that allows the hearing judge or mental health review officer to review "any relevant information even if it would be normally excluded under rules of evidence if he believes that such information is reliable." R.D. argues, inter alia, that because this provision allows a commitment order to be entered on the basis of hearsay, it deprives the affected individual of due process. We conclude that in balancing the therapeutic purposes advanced by the Mental Health Procedures Act against the liberty interest of the person committed, section 303(c) does not violate due process. Further, we find that the specific hearsay evidence complained of possessed sufficient indicia of reliability to sustain R.D.'s commitment under section 303. Thus, we affirm the order denying R.D.'s petition for review.
¶ 2 The facts, as gleaned from the record, show that three days before the section *551 303 petition was filed, R.D. had been involuntarily committed for emergency psychiatric treatment of five days (120 hours) duration at Mercy Hospital of Philadelphia (MHOP) under section 302 of the Act. The five day commitment order was based in part on certain averments contained in the section 302 petition of Marilyn Miles, the operator of a boarding home in which appellant was residing. The section 302 petition averred, inter alia, that R.D. was refusing to take her medication, was refusing to eat, had threatened to set fire to the home and had "picked up her cane and threatened the caregiver (to hit caregiver)[.]"[2] The section 302 petition, which requested that the County Administrator issue a warrant authorizing R.D.'s transport to a psychiatric facility for examination, was granted and R.D.'s involuntary 120 hour commitment into treatment at MHOP started on the evening of February 17, 1998, after Dr. Charles McGlynn of MHOP examined R.D. and found her to be severely mentally disabled and in need of treatment.[3]
¶ 3 Two days later, on February 19, 1998, a section 303 petition was filed by the Philadelphia County Office of Mental Health (OMH) on behalf of the petitioner, MHOP. MHOP sought to have R.D.'s involuntary treatment extended by an additional twenty days. The petition included the results of an examination of R.D. conducted on February 18, 1998, by an MHOP attending psychiatrist who found her to possess aggressive impulses, poor impulse control, poor judgment, a lack of insight into her mental illness and displays of anger. The psychiatrist affirmed that, based on his examination of her, R.D. continued to be severely mentally disabled and in need of treatment. The informal conference on MHOP's section 303 petition to extend R.D.'s involuntary emergency treatment convened on Friday, February 20, 1998, at 9:00 a.m.
¶ 4 Section 303 provides, in pertinent part:
§ 7303. Extended involuntary emergency treatment certified by a judge or mental health review officer-not to exceed twenty days
(a) Persons Subject to Extended Involuntary Emergency Treatment.-Application for extended involuntary emergency treatment may be made for any person who is being treated pursuant to section 3021 whenever the facility determines that the need for emergency treatment is likely to extend beyond 120 hours. The application shall be filed forthwith in the court of common pleas, and shall state the grounds on which extended emergency treatment is believed to be necessary. The application shall state the name of any examining physician and the substance of his opinion regarding the mental condition of the person.
....
(c) Informal Conference on Extended Emergency Treatment Application.-(1) *552 At the commencement of the informal conference, the judge or the mental health review officer shall inform the person of the nature of the proceedings. Information relevant to whether the person is severely mentally disabled and in need of treatment shall be reviewed, including the reasons that continued involuntary treatment is considered necessary. Such explanation shall be made by a physician who examined the person and shall be in terms understandable to a layman. The judge or mental health review officer may review any relevant information even if it would be normally excluded under rules of evidence if he believes that such information is reliable. The person or his representative shall have the right to ask questions of the physician and of any other witnesses and to present any relevant information. At the conclusion of the review, if the judge or the review officer finds that the person is severely mentally disabled and in need of continued involuntary treatment, he shall so certify. Otherwise, he shall direct that the facility director or his designee discharge the person.
1 Section 7302 of this title.
Mental Health Procedures Act, § 303(a), (c)(1).
¶ 5 In support of its section 303 petition, MHOP first presented the averments contained in the previously granted section 302 petition.[4] MHOP next presented the testimony of consulting psychiatrist, Dr. Ladenheim, who had examined R.D. earlier that same day. Dr. Ladenheim testified that R.D. expressed "vague paranoid ideas about the staff at the boarding home" and that "she feels that she was being held hostage at the boarding home." Dr. Ladenheim further testified that R.D. suffered from schizo-affective disorder and had undergone several recent psychiatric hospitalizations of varying length. The most recent hospitalization prior to R.D.'s involuntary commitment ended on February 10, 1998, when she became a resident of the boarding home. He testified that by February 17, 1998, the date when R.D. was involuntarily committed to MHOP on a section 302 petition, she had stopped taking her psychotropic medications. Moreover, he testified that her verbal threat "to hit the boarding home proprietor" was a manifestation of R.D.'s mental illness. He testified that R.D. was "having difficulty adjusting to life in the community" and that a twenty day extension under section 303 was requested because "we are seeking to avoid another rapid rehospitalization."
¶ 6 After Dr. Ladenheim finished his testimony, R.D., who is apparently either fully or functionally deaf, testified against the advice of counsel as follows:
[R.D.]: Let me speak. I have the right to say what I think, don't I? (inaudible) Let me speak too, my part.
MR. HOULON: Can the interpreter instruct her ...
MS. SHREEVES [R.D.'s COUNSEL]: Okay. I'm just going to advise that she would be testifying against the advice of counsel if she insists, because, at this point, it would be my intent to rest based on what I feel is the insufficiency of the allegations.
[R.D.]: Why? Why should I shut up, why?
MR. HOULON: Do you have questions for the doctor?
MS. SHREEVES: No. I don't have any questions. Did you explain to her what I just said? Does she still insist on testifying?
*553 [R.D.]: It would be better just to kill me and get it over with because I feel dead already. I just want to say one line, that's all.
RESPONDENT SWORN
[R.D.]: Honest, I'm always honest. Truth, I'm always telling the truth. I never hurt no one in my life, only with my mouth.
MS. SHREEVES: [R.D.], Ms. Miles' statement indicates that you attempted to or threatened to hit her with a cane. Is that true?
[R.D.]: When (inaudible) my case manager who treats me, I wanted to scare her and tell the truth. I wanted to scare her. I would never use nothing to harm nobody. I'm not that type of human being.
MR. HOULON: I don't know what we should do here because I don't know if I understood what she said.
MS. SHREEVES: Me neither.
....
MS. SHREEVES: ...Let me change the form of the question.
[R.D.]: I wasn't born deaf. I used to be beautiful.
MS. SHREEVES: Did you hear the - Did you try to hit Ms. Miles?
THE INTERPRETER: Do what?
MS. SHREEVES: Try to hit Ms. Miles.
[R.D.]: I never tried to hit no one with nothing. Only scare them.
MS. SHREEVES: Okay. I have no further questions.
MR. HOULON: I don't have any questions of Ms. Shreeves' client.
¶ 7 The parties then proceeded to argument. R.D.'s counsel challenged the admissibility of Ms. Miles' statements on the basis of hearsay and argued that Ms. Miles' failure to appear at the conference raised a credibility issue which eroded her reliability.
¶ 8 At the conclusion of the conference the review officer entered a certification order extending R.D.'s involuntary treatment an additional twenty days, or until March 12, 1998. R.D. appealed therefrom under section 303(g) which provides that where a hearing is conducted by a mental health review officer, a person made subject to involuntary treatment shall have the right to petition the court of common pleas for review of the certification. On March 6, 1998, several days after R.D. had been released from involuntary treatment at MHOP, the petition for review was heard. Therein, R.D.'s counsel requested that R.D.'s "record be vacated ... and expunged because the involuntary commitment was based on an insufficient record which in and of itself was solely based on hearsay." The petition for review was denied by order dated April 28, 1998, and this appeal followed.
¶ 9 Initially, although R.D. was released from involuntary treatment prior to both the lower court's review of the hearing officer's certification order and the filing of the appeal from the denial of R.D.'s petition for review, the issue raised is nonetheless justiciable.
We recognize that an important liberty interest is at stake in all involuntary commitments and by their nature, most commitment orders expire prior to appellate review. See In re Condry, 304 Pa.Super. 131, 450 A.2d 136, 137 (1982). Since a finding of mootness would allow such claims to go unchallenged in most, if not all, cases, we continue to hear these matters and, where the facts allow, we have authority to vacate a commitment order and direct that the record be expunged. See In re S.O., 342 Pa.Super. 215, 492 A.2d 727 (1985).
In re S.L.W., 698 A.2d 90, 92 (Pa.Super.1997). See also In re J.M., 556 Pa. 63, 71 n. 6, 726 A.2d 1041, 1045 n. 6 (1999) (appeals from expired involuntary commitment orders not moot as the issues raised on appeal are capable of repetition and may evade review).
*554 ¶ 10 R.D. asserts first that admission of hearsay evidence under section 303 infringed her state and federal due process rights and impermissibly violated her liberty interest. R.D. argues that "[t]he immense individual interests involved in civil commitment lead inexorably to analogy with the criminal justice system," and asserts a concomitant need for similar protections. R.D.'s argument poses a question of first impression under section 303. Accordingly, we shall determine whether a commitment decision under section 303 violates due process where the decision was based, in part, on hearsay.
¶ 11 "It is well-settled that involuntary civil commitment of mentally ill persons constitutes deprivation of liberty and may be accomplished only in accordance with due process protections." In re Hutchinson, 500 Pa. 152, 156, 454 A.2d 1008, 1010 (1982). However, "[d]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. [D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citations omitted). We must be mindful that the fundamental purpose of any protections we apply is to minimize the risk of erroneous decisions. Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). To discern the demands of due process, we must adjudge the necessity of the protection sought in view of the nature and purpose of the underlying deprivation and the potential consequences in the absence of that protection. See id. at 418, 425-27, 99 S.Ct. 1804 (mandating standard of proof by "clear and convincing evidence" to civil commitments of indefinite term based on adverse social consequences to individual committed and risk that factfinder might commit individual based on "a few isolated instances of unusual conduct"); Allen v. Illinois, 478 U.S. 364, 373-74, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (declining to adopt privilege against self-incrimination under commitment statute for "sexually dangerous persons" because statute's objective was therapeutic rather than penal); In re J.M., 556 Pa. 63, 75-76 n. 9, 726 A.2d 1041, 1047-48 n. 9 (1999) (declining to require showing of probable cause for issuance of warrant under section 302 "[i]n light of the emergency nature, therapeutic purpose and short duration" of warrant); Hutchinson, 500 Pa. at 157, 454 A.2d at 1011 (providing right to effective assistance of counsel under section 304 because without it individual's procedural due process rights "would be rendered worthless"); In re Hancock, 719 A.2d 1053, 1057 (Pa.Super.1998) (applying clear and convincing evidence standard of proof to twenty day commitment under section 303 to reduce risk that in relaxed setting of an informal conference "fact finder may be blinded by a set of isolated incidents").
¶ 12 We gauge potential consequences in light of their impact on the interest of the state in providing mental health treatment to potentially dangerous individuals and on the interest of individuals in freedom from confinement. Hutchinson, 500 Pa. at 156-57, 454 A.2d at 1010. We note, however, that "when a legislature `undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation.'" Kansas v. Hendricks, 521 U.S. 346, 359 n. 3, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). "`The right of the judiciary to declare a statute void, and to arrest its execution, is one which, in the opinion of all courts, is coupled with responsibilities so grave that it is never to be exercised except in very clear cases.'" Schubach v. Silver, 461 Pa. 366, 381 n. 12, 336 A.2d 328, 335 n. 12 (1975) (quoting Erie & North-East Railroad Co. v. Casey, 26 Pa. 287, 300-301 (1856)). Consequently, we will not compromise the legislative scheme of the Act so long as we find it supported by proper procedures and evidentiary standards. See Hendricks, 521 *555 U.S. at 357, 117 S.Ct. 2072 (stating that because individual liberty interest does not provide absolute right to be free of restraints in all circumstances, Supreme Court has consistently upheld involuntary commitment statutes "provided the confinement takes place pursuant to proper procedures and evidentiary standards").
¶ 13 The legislature's purpose in enacting the Mental Health Procedures Act was "to assure the availability of adequate treatment to persons who are mentally ill" and "to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others." Mental Health Procedures Act, § 102. See also In re McMullins, 315 Pa.Super. 531, 462 A.2d 718, 722 (1983). To achieve these objectives within the constraints of due process "the scheme adopted by the legislature here envisions that more extensive procedural or `due process' protections will apply as the amount of time a person may be deprived of liberty increases above a bare minimum." Matter of Seegrist, 517 Pa. 568, 574, 539 A.2d 799, 802 (1988). The resulting progression in sections 302, 303, and 304, evinces the legislature's clear concern that the procedural protections afforded our citizens reflect the extent of the deprivation of liberty at stake. In re Hancock, 719 A.2d 1053, 1057 (Pa.Super.1998).
¶ 14 Section 302, which provides for involuntary emergency examination and treatment, allows confinement of the patient for up to 120 hours upon certification by a physician, or authorization by the county mental health administrator. Mental Health Procedures Act, § 302(a), (d). Though action by the administrator requires issuance of a warrant, "[i]n light of the emergency nature, therapeutic purpose and short duration" of a section 302 commitment, the warrant need not be supported by probable cause and may be based upon hearsay. In re J.M., 556 Pa. at 75-76 n. 9, 726 A.2d at 1046-47 n. 9.
¶ 15 Section 303 provides for extended involuntary emergency treatment whenever, following a patient's commitment under section 302, "the facility [where the individual is currently under treatment] determines that the need for emergency treatment is likely to extend beyond 120 hours." Mental Health Procedures Act § 303(a). To ensure that the individual's liberty interest is protected, section 303 subjects the facility's determination to substantial legal scrutiny. Application for continued treatment must be made to the court of common pleas and shall state the grounds on which treatment is to be imposed along with the name of any examining physician and the substance of his opinion regarding the mental condition of the patient. Id. at § 303(a). Because a patient may be confined under section 303 for as long as twenty days, the legislature has mandated a right to counsel, and the right to an informal hearing, at which counsel may question the examining physician and other witnesses. Id. at § 303(b), (c). Though the rules of evidence need not be applied, the reviewing judge or mental health review officer (MHRO) must confine his consideration to evidence he deems reliable. Id. at § 303(c). Moreover, we have held that a patient may not be confined under section 303 on a showing of less than "clear and convincing evidence." In re Hancock, supra at 1058.
¶ 16 Section 304 provides for extended involuntary treatment for as long as ninety days and, consistent with the scheme of the Act, requires additional due process protections including a formal public hearing. Mental Health Procedures Act § 304(e). Significantly, though the section is not a penal provision, it provides some protections consistent with criminal due process, including the right to confrontation and cross-examination. See In re J.M., supra at 74-75 n. 8, 726 A.2d at 1047 n. 8. In applying section 304, our supreme court has held that "it is imperative that the commitment court strictly comply with the rules of evidence generally applicable *556 to other proceedings which may result in an extended deprivation of an individual's liberty." In re Hutchinson, 500 Pa. at 159 n. 8, 454 A.2d at 1012 n. 8. Consideration of hearsay is not consistent with due process protections under section 304. See id. at 159 n. 8, 454 A.2d at 1011-12 n. 8.
¶ 17 Though our supreme court has not had occasion to address whether due process requires exclusion of hearsay under section 303, it has rejected prior attempts to expand due process protections in informal proceedings beyond those provided by the Act. Recently, the Court reversed a decision of the superior court that required a showing of probable cause for issuance of a warrant under section 302 and proscribed the use of hearsay as the basis for the warrant. See In re J.M., 556 Pa. at 78, 726 A.2d at 1049. The Court found that such safeguards, though necessary in the context of a criminal investigation, are detrimental to the purposes advanced by the Act. Id. at 76-77, 726 A.2d at 1048 (reasoning that "requirement [of showing of probable cause prior to issuance of warrant] would only serve to frustrate the very purpose of the emergency evaluation and treatment sections of [the Act,] which is to render immediate assistance to those persons who are in need"). The Court concluded that "[i]n light of the emergency nature, therapeutic purpose and short duration" of a commitment under section 302 the reasonable grounds standard imposed by the Act was sufficient to meet the demands of due process. Id. at 75-76 n. 9, 726 A.2d at 1048 n. 9 (citing Parham v. J.R., 442 U.S. 584, 608, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)).
¶ 18 Similarly, in Matter of Seegrist, 517 Pa. at 574-75, 539 A.2d at 802, the Court declined to allow application of protections under section 304(e)(4) to a section 303 hearing. Section 304(e)(4) contemplates that the formal hearing prior to a ninety-day commitment may be held in private at the request of the patient or his counsel. Balancing the parties' interest in such a procedure, the Court opined that a section 303 commitment is often focused on acquiring necessary psychiatric data to gauge the patient's need for further treatment. Id. The Court found, accordingly, that the patient's interests were adequately protected under section 303, and decried the section 304 procedure as a "troublesome procedural device" inappropriate in the less formal setting of section 303. Id.
¶ 19 Though neither of the foregoing decisions addresses the specific issue before us, both demonstrate our supreme court's recognition that, in the context of mental health treatment, the valid liberty interest of the individual and the interest of the Commonwealth are both served by measured due process protections. Indeed, the Court has admonished "if involuntary treatment is all that is available to protect a person from harm and even death, then the availability of this form of medical treatment is to be valued and encouraged." In re J.M., 556 Pa. at 74, 726 A.2d at 1047 (quoting In re J.S., 526 Pa. 418, 428, 586 A.2d 909, 914 (1991)). We conclude that due process protections additional to those provided by the Act should not be applied so long as reasonable due process safeguards, appropriate to the treatment needs of the patient, are provided by the statute itself.
¶ 20 After careful scrutiny of the provisions of the Act and its therapeutic purposes, as well as the respective interests of the parties in pursuing or opposing the commitment process, we find the due process protections provided by section 303 reasonable and appropriate. As we have discussed, section 303 provides numerous procedural safeguards to assure that a patient's prospective need for treatment is determined in a considered legal proceeding. Initially, the patient's right to counsel assures his ability to challenge unreliable evidence, and to develop countervailing facts that may explain his conduct and militate against certification. Secondly, the court's role as factfinder eliminates the need for strict adherence to rules of evidence and helps to ensure a dispassionate *557 decision based on reliable evidence. Finally, the applicable standard of proof, by clear and convincing evidence "places the burden squarely on the facility or individual attempting to commit the individual involuntarily," and renders "negligible" the chance of an erroneous commitment. In re Hancock, 719 A.2d at 1058. Moreover, the supreme court's direction that commitment under section 304 must be subject to full due process protections eliminates the possibility that an individual could be confined on the basis of hearsay for longer than twenty days. Given these substantial protections, we conclude that a prohibition against the use of hearsay evidence is not necessary to protect the individual's valid liberty interest under section 303. Moreover, requiring adherence to the rules of evidence could render adequate proof impracticable and unduly compromise the interest of the Commonwealth in assuring the availability of emergency mental health treatment to those whose condition precludes their recognition of a need for assistance. See In re Hutchinson, 500 Pa. at 159, 454 A.2d at 1011. Because the Act operates to provide treatment necessary to the individual committed and does so within a framework of effective due process protections, we hold that admission of hearsay under section 303(c) is not, per se, a violation of due process.
¶ 21 Reaching this conclusion, however, does not end our inquiry. Section 303 provides that the judge or MHRO presiding at the commitment conference "may review any relevant information even if it would be normally excluded under rules of evidence if he believes that such information is reliable." Mental Health Procedures Act, § 303(c)(1). Our supreme court has directed that, in proceedings where the rules of evidence are not applied, the reliability of hearsay must be determined by a consideration of the following factors:
Although indicia of reliability must ultimately be evaluated on a case by case basis, several factors typically would be significant:
E.g., whether the hearsay statements are contradicted by direct testimony; whether the statements are sworn or unsworn, written or oral, signed or anonymous; whether the declarant is disinterested or is potentially biased; or whether the hearsay is corroborated. The type of hearsay offered is also a factor: For example, some documents, such as reports and itemized statements of charge from licensed professionals, may be typically more trustworthy than documents of more subjective content. If hearsay is introduced by live testimony, the credibility of the witness is, of course, to be considered.
Com., Unemployment Compensation Board of Review v. Ceja, 493 Pa. 588, 607-08, 427 A.2d 631, 641 (1981) (footnote omitted).
¶ 22 In the instant matter, R.D. alleges that the hearsay averments at issue lacked sufficient indicia of reliability. She argues that, due to the unreliable nature of the evidence, the evidence was insufficient to show that R.D. was "severely mentally disabled" as that term is defined by the Act.[5] The gravamen of her claim is that no *558 proper showing was made that R.D. "inflicted or attempted to inflict serious bodily harm on another[.]" Mental Health Procedures Act, § 301(b). We disagree.
¶ 23 After careful review, we conclude that the testimony of Dr. Ladenheim presented at the section 303 hearing and the properly admitted psychiatric/diagnostic evidence contained in the section 303 petition substantiated the reliability of the hearsay averments set forth in the section 302 petition.
¶ 24 First, it was established that R.D. regularly employs a cane as an aid in ambulation. The section 302 petition set forth that R.D. raised her cane in an attempt to hit a "caregiver" at the boarding home. Dr. Ladenheim testified that R.D. felt like she was a hostage at the boarding home and expressed vague paranoia about the staff there. He testified that she admitted to verbally threatening to harm the boarding home proprietor. He characterized R.D.'s verbally threatening behavior as a manifestation of her mental illness. R.D. testified that she wanted to "scare" someone at the boarding home. She admitted making verbal threats and using obscenities toward staff at the boarding home. She did not deny refusing to eat or threatening to burn down the boarding home. She admitted to refusing her medication, apparently because she was angry with boarding home staff.
¶ 25 Second, the section 303 petition contained an affirmation by MHOP's attending psychiatrist that, on the day prior to the hearing, R.D. was evaluated as having aggressive impulses, poor impulse control, anger and poor judgment. These findings were essentially corroborated by Dr. Ladenheim's testimony.
¶ 26 Third, Dr. Ladenheim testified that if R.D.'s involuntary treatment was not extended, the behavior she displayed at the boarding home, which included the refusal to take medication, would be repeated. Apparently in fear of a rapid decompensation of R.D.'s mental state and a recurrence of R.D.'s aggressive and non-compliant behavior if discharged from the hospital and back to the boarding home, Dr. Ladenheim testified that MHOP sought an additional twenty days of involuntary treatment, during which one of the focus areas of treatment would be the procurement of some other living arrangement for R.D. R.D.'s counsel had no questions for Dr. Ladenheim and his testimony was uncontradicted.
¶ 27 We conclude that these uncontested facts lent sufficient reliability to the challenged averment that R.D. "picked up her cane and threatened the caregiver (to hit the caregiver)," despite R.D.'s insistence that "I never tried to hit no one with nothing[,] only scare them." We find that the act of picking up one's cane in an effort to hit another, once properly established by the evidence, satisfies the statutory requirement of an attempt to inflict serious bodily harm. Moreover, it was uncontradicted that verbal threats of harm were made by R.D. toward boarding home staff. We therefore conclude that by raising her cane concomitant with those threats of harm, R.D. committed an "act in furtherance of the threat to commit harm" as contemplated by the statute defining clear and present danger to others.
¶ 28 We similarly conclude that the uncontested testimony supported the hearsay averments that R.D. was refusing to eat and refusing to take her medication. We have held that a person may be involuntarily *559 committed under the Act only upon a showing, by clear and convincing evidence, that he or she is "severely mentally disabled." In re Hancock, 719 A.2d at 1055, 1058. Such a finding may properly be made if it is shown that the person subject to the Act poses a clear and present danger to herself because of an incapacity to care for her own personal needs. Mental Health Procedures Act, § 301(a). In order to prove a person poses a clear and present danger to herself, it must be shown that in the last thirty days she has acted in such manner as to demonstrate that she is unable without care, supervision and the continued assistance of others to satisfy her need for nourishment and medical care such that if the involuntary treatment were not afforded, she would suffer serious bodily injury or serious physical debilitation. Mental Health Procedures Act, § 301(b)(2).
¶ 29 In the instant matter, R.D. did not deny she was refusing to eat at the boarding home. Moreover, the uncontradicted evidence established that prior to her commitment, R.D. refused to take her psychotropic medication:
[DR. LADENHEIM] .... She acknowledges needing medications, but she was non-compliant with her medications for two days prior to [the § 302] admission because she says the people at the boarding home were being [...]
[R.D (INTERRUPTING)]: I didn't want to do that because of the behavior, that's the way she acted.
¶ 30 Further, it was conclusively established that without extended involuntary treatment, R.D.'s pre-admission behavior would likely recur. Accordingly, we find that the challenged hearsay was sufficiently reliable for consideration by the mental health review officer and we conclude that MHOP sufficiently proved under the clear and convincing standard that R.D. was "severely mentally disabled" as that term is defined by the Act.
¶ 31 Appellant next claims the court, at the hearing on the petition for review, improperly faulted R.D.'s counsel for failing to request a continuance when Ms. Miles failed to appear at the section 303 informal conference. Our review of the record reveals that a discussion took place during the hearing on R.D.'s petition for review regarding Ms. Miles failure to appear at the section 303 informal conference. Therein, the court questioned counsel for both parties why a continuance could not have been sought in order to secure Ms. Miles appearance. However, there is no indication that the court considered the failure of either party to seek a continuance as a dispositive factor in denying the petition for review. It appears, rather, that the court was merely commenting that had Ms. Miles appearance been secured and her testimony presented at the section 303 hearing, the issue regarding the reliability of her section 302 averments might well have been avoided. We reject appellant's argument that, in so doing, the court improperly "shift[ed] the burden of advancing the commitment hearing from the petitioner to R.D."
¶ 32 Appellant's final claim is that the court, in its disposition of her petition for review, failed "to comply with the statutory requirements for review hearings mandating discharge of a petition if the person is no longer in need of treatment." (Emphasis added). Appellant misapprehends the language of the statute upon which she relies for support. On a petition for review, "if the court determines that further involuntary treatment is necessary and that the procedures prescribed by this act have been followed, it shall deny the petition. Otherwise, the person shall be discharged." Mental Health Procedures Act, §§ 109, 303(g) (emphasis added).
¶ 33 Here it is clear that by the time the petition for review was heard, R.D. had been discharged from involuntary treatment because she no longer required it. Nonetheless, the petition for *560 review was not withdrawn by R.D., but was advanced for the purpose of requesting that the "record [of involuntary commitment] be vacated ... and expunged[.]" Obviously, R.D.'s petition for review was not advanced for the purpose of securing her personal discharge from involuntary treatment. Without discussion of whether a petition for review of an involuntary commitment certification is appropriate where the petitioner has already been discharged from involuntary treatment, it is apparent that in such a dubious case, the statute does not in any way mandate the court to "discharge" the petition which resulted in the person's involuntary commitment or to expunge the record. Rather, the statute plainly provides that, on review, the person is to be discharged unless the court determines that further involuntary treatment is necessary. Appellant's reliance on the statute is misplaced and, thus, her final issue on appeal is dismissed.
¶ 34 In conclusion, we find no per se due process violation in section 303(c) of the Mental Health Procedures Act. The section properly allows normally excludable evidence to be considered by a judge or mental health review officer at an informal conference on application for extended emergency involuntary treatment if the judge or review officer believes the information is reliable. Moreover, in the instant matter, we conclude that sufficient indicia of reliability existed to warrant consideration of the normally excludable evidence presented. Thus, we affirm the order which denied appellant's petition for review from the certification order of extended involuntary treatment under section 303.
¶ 35 Order affirmed.
¶ 36 Judge JOHNSON files a Concurring and Dissenting opinion.
JOHNSON, J., concurring and dissenting:
¶ 1 I concur in the Majority's well-reasoned conclusion that admission of hearsay under section 303 of the Mental Health Procedures Act (the Act) is consistent with procedural due process so long as the evidence in question bears sufficient indicia of reliability. However, I respectfully dissent from the remainder of the Majority's disposition of the hearsay issue for three reasons. Initially, I disagree with the Majority's characterization of the record and dissent from its conclusion that the hearsay introduced in this case was sufficiently reliable to be admissible under section 303. Secondly, I dissent from the Majority's conclusion that the evidence was sufficient to establish that R.D.'s conduct "posed a clear and present danger to others," as prescribed by section 301(b) and defined by our caselaw. Thirdly, I dissent from the Majority's suggestion that R.D. was a "clear and present danger to herself" because the record does not establish that either the hearing officer or the trial court made such a determination in support of R.D.'s commitment. I shall address each of these considerations seriatim.
¶ 2 I first dissent from the Majority's conclusion that the hearsay allegations in the section 302 petition bore sufficient indicia of reliability to permit their admission as evidence at R.D.'s section 303 commitment conference. Section 303 provides that the judge or Mental Health Review Officer presiding at the commitment conference "may review any relevant information even if it would be normally excluded under the rules of evidence if he believes that such information is reliable." Mental Health Procedures Act § 303(c)(1). Our Supreme Court has directed that, in proceedings where the rules of evidence are not applied, the reliability of hearsay must be adjudged on numerous factors bearing on the context in which the hearsay statement was made:
Although indicia of reliability must ultimately be evaluated on a case by case basis, several factors typically would be significant:

*561 E.g., whether the hearsay statements are contradicted by direct testimony; whether the statements are sworn or unsworn, written or oral, signed or anonymous; whether the declarant is disinterested or is potentially biased; or whether the hearsay is corroborated. The type of hearsay offered is also a factor: for example some documents such as reports and itemized statements of charge from licensed professionals, may be typically more trustworthy than documents of more subjective content. If hearsay is introduced by live testimony, the credibility of the witness is, of course, to be considered.
Unemployment Compensation Board of Review v. Ceja, 493 Pa. 588, 607-06, 427 A.2d 631, 641 (1981).
¶ 3 Upon review of the hearsay at issue in this case, I find little indication of reliability. As the Majority has noted, the statement in question was made as an allegation in support of the application upon which R.D. was committed under section 302. The declarant, Marilyn Miles, was the administrator of the boarding home where R.D. was residing, and though the record is silent on the issue of Miles' qualifications, she was presumably aware of the consequences inherent in the application. While the gravity of the section 302 application and Miles' capacity at the boarding home tend to suggest that the statement is reliable, other factors demonstrate that, clearly, it is not. Most significant is the entirely subjective nature of Miles' allegations, which consist of few observations and numerous conclusions bearing more on Miles' state of mind when she filed the petition than R.D.'s antecedent conduct. Miles alleged:
Client has made serious threats to caregiver. She also made serious threatening gestures to caregiver. Client has also threatened to burn the house down. This particular threat was very serious and poses concerns. Client has refused to take medication [and] refuses to eat. This is a concern because of health. Client has picked up her cane and threatened the caregiver (to hit caregiver)[.]
Application for Involuntary Emergency Examination and Treatment, 2/17/98, at page 3 of 7. Though the statement reflects Miles' perception that R.D. had issued threats, it fails to establish precisely what they were or even whether they were physical, or merely verbal. Similarly, while Miles repeatedly characterized such threats as "serious," she provided little factual description by way of which any reviewing tribunal could evaluate the accuracy of her characterization. To the extent the petition asserts "threatening gestures," it fails to detail the acts involved and, consequently, provides no basis upon which an impartial factfinder could adjudge the veracity of Miles' observation. Moreover, Miles' description of R.D.'s single physical act, i.e. "picked up her cane and threatened the caregiver," is cloaked in speculation as to R.D.'s purpose, i.e. "(to hit caregiver)." Of equal significance, the statement fails even to indicate whether Miles was in fact the "caregiver" to whom R.D. had spoken. Significantly, the record is silent on this issue. In the event that Miles was not the caregiver, her assertions about R.D.'s conduct are rendered multiple hearsay, the reliability of which would be highly suspect even if Miles had herself appeared at the section 303 hearing. Miles' failure to appear at the hearing, despite service of a subpoena, causes me grave concern whether she would, or could, attest the veracity of her allegations in a recorded legal proceeding. I conclude accordingly, that Miles' hearsay statement was not sufficiently reliable for the Mental Health Review Officer's consideration under section 303.
¶ 4 I dissent also from the Majority's conclusion that the evidence was sufficient to sustain the Mental Health Review Officer's conclusion that R.D. posed a clear and present danger to others. We have held that a person may be involuntarily committed under the Act only upon a *562 showing, by clear and convincing evidence, that he or she is "severely mentally disabled." In re Hancock, 719 A.2d 1053, 1058 (Pa.Super.1998). A person is severely mentally disabled when, as result of mental illness, "he poses a clear and present danger of harm to others or to himself." Mental Health Procedures Act § 301(a). The Act provides that a person is a "clear and present danger to others" if "within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another" and there is a reasonable probability that he or she will commit similar conduct again. Id. at § 301(b). A finding made pursuant to section 301 must be based on the individual's commission of an overt act. In re S.C., 280 Pa.Super. 539, 421 A.2d 853, 857 (1980). Unless these prerequisites are met, involuntary commitment under the Act is not lawful. Commonwealth v. Blaker, 293 Pa.Super. 391, 446 A.2d 976, 980 (1981).
¶ 5 The record of R.D.'s section 303 hearing establishes, without contradiction, that on the date of the hearing, R.D. was mentally ill, suffering from schizo-affective disorder. N.T., 2/24/98, at 8. However, I find the competent evidence insufficient to establish that R.D. was a clear and present danger to others as defined by section 301(b). The record of the section 303 hearing consists of the testimony of two witnesses, R.D. and the examining physician, Dr. Ladenheim. Though R.D. admitted having issued a verbal threat to her caregiver, she denied acting in furtherance of the threat. Id. at 12. Dr. Ladenheim testified that R.D. admitted to him that she had threatened, verbally, to hit her caregiver and had spoken "unkind words," but denied attempting to strike anyone. Id. at 7. Though the doctor opined that R.D. had "vague paranoid ideas" about the staff at the boarding home, he concluded that "she had no suicidal or homicidal ideations," and she acknowledged her mental illness. Id. at 6. Neither Dr. Ladenheim nor R.D. provided any testimony to substantiate a finding that R.D. had "inflicted or attempted to inflict serious bodily harm on another." Significantly, when asked why he recommended that R.D. be confined as an inpatient rather than treated as an outpatient, Ladenheim proffered that "[R.D.] is having difficulty adjusting to life in the community at this point, and we are seeking to avoid another rapid rehospitalization." Id. at 11. When asked about R.D.'s treatment regimen upon commitment, Ladenheim stated that "the major thrust of the treatment now [would be] devoted to working with her intensive care management team ... in finding [R.D.] a new place to live." Id. at 8. Neither of these considerations bears any direct relevance to a determination under section 301 of whether R.D. posed a clear and present danger to others.
¶ 6 Though I recognize, in Ladenheim's testimony, a concern for R.D.'s best interest, I cannot condone substitution of the good intentions of the state for the legal protections of the Act. Even amongst the medically sensitive considerations prevalent in mental health issues, we have in the past recognized, and must continue to recognize, the primacy of individual liberty.
When the awesome power of the government bureaucracy and the courts is brought to bear on the individual citizen, good intentions are not enough. Even though they may be motivated by a desire to help the individual, the actions of the government must be strictly circumscribed by the law. This is most particularly mandatory when the governmental action involves the deprivation of the citizen's liberty. The courts, in overseeing such liberty-depriving bureaucratic action, must be especially protective of the rights of the individual and vigilant in ensuring that the legal safeguards have been complied with.
In re Remley, 324 Pa.Super. 163, 471 A.2d 514, 517 (1984).
¶ 7 Accordingly, my colleagues have concluded, even under more compelling *563 circumstances, that the statutory definition of "clear and present danger to others" was not met. See Remley, 324 Pa.Super. 163, 471 A.2d 514, 516 (panel of Brosky, Montgomery and Cercone, JJ., holding that where 82-year-old man kicked his wife in the abdomen, but wife stated "[H]e didn't kick me that hard," evidence failed to establish that man inflicted or attempted to inflict serious bodily injury); Blaker, 446 A.2d at 978-79 (majority of Spaeth and Cavanaugh, JJ., holding that where 60-year-old woman hit bus driver with umbrella when he attempted to escort her onto bus, evidence did not establish that her conduct, even if repeated, could lead to death or serious bodily injury).
¶ 8 In the case before us, I am compelled to a similar conclusion. The competent evidence fails entirely to establish that R.D committed any overt act that might precipitate serious bodily harm to another. The "verbal threats" on which the Majority relies, coupled with "the act of picking up one's cane in an effort to hit another," op. at 558, are simply not sufficient to satisfy the requisites of section 301. Indeed, on the record before us, I am left to question how a 56-year-old woman who walks with the aid of cane could pose a threat of harm to anyone when the very instrumentality that enables her to move about is said to double as her weapon of choice. In the absence of additional evidence, we are left only with a diagnosis of mental illness and the good intentions of the Commonwealth. Though I recognize that the state has a valid interest in providing care and assistance to the unfortunate, I remain mindful as well that "the mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution." In re S.C., 421 A.2d at 856 (quoting O'Connor v. Donaldson, 422 U.S. 563, 575, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)). I conclude accordingly that because the evidence fails to satisfy the statutory requisites of section 301, R.D.'s commitment under section 303 was unlawful. Blaker, 446 A.2d at 980.
¶ 9 Finally, I dissent from the Majority's apparent conclusion that R.D. "pose[d] a clear and present danger to herself because of an incapacity to care for her own personal needs," op. at 559, as I believe it constitutes a discreet finding of fact that neither the Mental Heath Review Officer nor the trial court undertook to make.
¶ 10 In cases of involuntary commitment, where the court serves as factfinder, the permissible scope of appellate review is limited to whether that court's findings are supported by the record. See Commonwealth v. Romett, 372 Pa.Super. 41, 538 A.2d 1339, 1342 (1988) (reviewing whether evidence was sufficient to establish trial court's finding that patient's conduct demonstrated the need for continuing involuntary treatment under section 305 of the Act). The record in this case demonstrates, beyond peradventure, that the Mental Health Review Officer ordered R.D.'s commitment solely on the basis of the danger R.D. posed to others, without reference to any danger she may have posed to herself. Accordingly, I cannot discern how evidence that R.D. refused to eat or that she did not take her medication for two days prior to her initial commitment under section 302 is material to our review of her commitment under section 303. The Majority's reliance upon such evidence as a basis for affirmance, in the absence of any plausible indication in the record that it served as the basis for the disposition below, amounts to a finding of fact. Even if supported by evidence adduced at the section 303 hearing, such a finding is beyond the permissible scope of this Court's review.
¶ 11 Based upon my review of the briefs and the record, and after carefully reviewing the reasoning of my distinguished colleagues, I concur in their conclusion that admission of hearsay at a section 303 hearing does not violate applicable due process protections. However, I disagree with the Majority's disposition of the remaining aspects of the hearsay issue because: *564 1) the hearsay adduced in this case does not evince sufficient indicia of reliability to be considered under section 303 of the Act; 2) the competent evidence is not sufficient to establish that R.D. was a clear and present danger to others within the meaning of section 301 of the Act, and; 3) the Majority's consideration of evidence material to a determination that R.D. was a clear and present danger to herself is inappropriate because neither the Mental Health Review Officer nor the trial court made such a determination. Accordingly, such evidence is beyond the permissible scope of appellate review.
¶ 12 Consequently, I respectfully dissent from the Majority's conclusion that R.D. was lawfully committed under section 303 of the Act.
NOTES
[1] 50 P.S. § 7303. All references to sections of the Act are cited to the original section numbers found in the Act of July 9, 1976, P.L. 817, No. 143. The Act has been published as Chapter 15 of Title 50, Mental Health, 50 Purdon's Statutes §§ 7101-7503.
[2] The verbatim text of the averments stated:

Client has made serious threats to caregiver. She also made serious threatening gestures to caregiver. Client has also threatened to burn the house down. This particular threat was very serious and poses concerns. Client has refused to take medication [and] refuses to eat. This is a concern because of health. Client has picked up her cane and threatened the caregiver (to hit caregiver)[.]
[3] The maximum allowable duration of involuntary commitment for psychiatric treatment under section 302 is 120 hours. The pertinent portion of the section provides:

(d) Duration of Emergency Examination and Treatment.-A person who is in treatment pursuant to this section shall be discharged whenever it is determined that he no longer is in need of treatment and in any event within 120 hours, unless within such period:
(1) he is admitted to voluntary treatment pursuant to section 202 of this act;2 or
(2) a certification for extended involuntary emergency treatment is filed pursuant to section 303 of this act.3
2 Section 7202 of this title.
3 Section 7303 of this title.
Mental Health Procedures Act, § 302(d).
[4] Marilyn Miles, the petitioner in the previous section 302 petition did not attend the section 303 proceeding. Although a subpoena for her appearance was prepared, it is unclear whether the subpoena was actually served on Ms. Miles. In any event, due to her absence from the proceeding, the averments Ms. Miles made on February 17, 1998, regarding R.D.'s initial need for emergency treatment under section 302, were incorporated into the record at the section 303 conference on February 20, 1998, over R.D.'s objection.
[5] The relevant portion of the Act provides as follows:

A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.
....
Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. ... For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.
....
Clear and present danger to himself shall be shown by establishing that within the past 30 days:
(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act[.]
Mental Health Procedures Act, § 301(a), (b)(1), (b)(2)(i)