J-S36032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.L. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 734 MDA 2024 |

Appeal from the Order Entered May 7, 2024
In the Court of Common Pleas of Centre County
Civil Division at 2024-CV-1087-MH

BEFORE:  LAZARUS, P.J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:          **FILED NOVEMBER 07, 2024**

K.L. (Appellant) appeals from the trial court's order extending his involuntary psychiatric treatment pursuant to the Mental Health Procedures Act (MHPA), 50 P.S. § 7101 *et seq*.  We affirm.

*Case History*

On April 25, 2024, Appellant's father sought "professional psychiatric help" for Appellant.  ***See*** Application for Extended Involuntary Treatment (Petition), 4/29/24, at 8.  According to his father, Appellant had "suffered from anxiety, depression and lack of sleep for many years."  ***Id.*** at 7.  However, Appellant's father relayed that in recent weeks, Appellant "started exhibiting erratic behavior, including religious, race and political delusions," and "started harassing [Appellant's] mother about the circumstances of [Appellant's] birth."  ***Id.***  Appellant's father described Appellant's language as increasingly "persistent, vile and violent."  ***Id.***  He further relayed that Appellant had

"accumulated, over the past month, an arsenal of weapons," including handguns and ammunition, as well as "a huge collection of [N]azi flags and badges." *Id.* at 8. Appellant's father felt he "had no option but to alert the authorities, … and [he and Appellant's mother] were granted an emergency [Protection from Abuse (PFA) order[1]], … which removed [Appellant] from [their] residence and confiscated his weapons." *Id.* Appellant's father "worried that [Appellant] is extremely mentally ill" and could "hurt himself, hurt us and hurt others." *Id.*

On April 25, 2024, Appellant was involuntarily committed for treatment at Mount Nittany Medical Center (MNMC) pursuant to 50 P.S. § 7302 (Section 302).[2] *Id.* at 2. The examining physician at MNMC noted Appellant's "paranoid delusions" and "religious preoccupation" in determining that he was in need of immediate inpatient treatment. *Id.* at 12.

_____

[1] Under the Protection from Abuse Act, a court "may grant any protection order … to bring about a cessation of abuse" between family or household members. *See* 23 Pa.C.S. §§ 6102(a) and 6108(a).

[2] Section 302 states:

> A person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely mentally disabled … and in need of immediate treatment. If it is determined that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begin immediately.

50 P.S. § 7302(b) (footnote omitted).

Four days into his commitment, on April 29, 2024, Appellant "was examined by Dr. Erica Marden and found to be in need of continued involuntary inpatient treatment." *Id.* at 2. Dr. Marden noted:

> [Appellant] has a history of trauma, anxiety and depression, and now is presenting with unspecified psychosis with paranoid ideation with focus on [a] need to have guns to protect his future family[,] recent statements of feeling his identity is a lie[,] and making threatening statements to his [current] family.

*Id.* at 3. Dr. Marden recommended continued "inpatient psychiatric treatment for diagnostic clarification, safety [and] stabilization, and ongoing recommendation for medication." *Id.* Because Section 302(d) requires that a person receiving treatment be discharged within 120 hours (5 days), MNMC representatives petitioned to extend Appellant's treatment pursuant to 50 P.S. § 7303(a) (Section 303) (providing that treatment may be extended for up to 20 days when "the facility determines that the need for emergency treatment is likely to extend beyond 120 hours").

The Mental Health Review Officer (MHRO) held a hearing on April 30, 2024.[3] The MHRO heard testimony from two witnesses: Dr. Marden and Appellant.

Dr. Marden identified herself as Appellant's treating psychiatrist at MNMC, and stated that Appellant was suffering from "unspecified psychosis."

---

[3] Although the cover page of the hearing transcript is dated May 1, 2024, the MHRO stated at the beginning of the hearing, "Today is April 30, 2024." N.T. at 5. Also, the MHRO's "Report of the Mental Health Review Officer" (Report) refers to the hearing date as April 30, 2024. Report at 1.

N.T., 4/30/24, at 6-7. According to Dr. Marden, "there was possibly some mild paranoia in the past, but this time there is much more psychosis and delusions than were ever seen in the past." *Id.* at 22.[4]

Dr. Marden testified that "there has not been any significant change in [Appellant's] condition since the time of admittance," and he "has refused all medication." *Id.* at 19-20. Further, she opined that Appellant "pose[d] a[] danger to others as a result of his current psychiatric condition." *Id.* at 8. She stated that while Appellant had not been violent at MNMC, "he has a lot of other symptoms and recent behaviors that raise concern for him having a very high acute risk of violence towards others." *Id.* at 8-9.

Dr. Marden explained that she performed "a violence risk assessment" of Appellant "over the last few days since he came in," and considered "information [she] gathered from multiple collateral sources." *Id.* at 9. She addressed various "factors that have been studied and thought to be involved." *Id.* Dr. Marden testified:

> [O]ne [factor] is a history of substance use disorder[; Appellant] has a history of opioid use disorder….
>
> Another thing we look at [is] his recent behavior, suggestive impulsivity, and he has multiple [instances], including he recently quit his job abruptly, he bought guns, he bought a [women's] ring even though he's not in a current relationship, he suddenly has been getting very involved in religious organizations[, has] a fixation on going to Germany to find his birth parents, and a sudden … intense interest in his genetic heritage.

---

[4] Dr. Marden testified that she obtained "helpful history" and information about Appellant from his former psychiatrist, Dr. Tim Derstine. N.T. at 27-28.

The last few months, he's been reported as having, quote, very strong outbursts, end quote, about Nazi Germany, making homophobic statements[,] and [express]ing fascist beliefs to his mother. He's reportedly given himself a new name, Gabriel, after a recent baptism.

Another risk factor we look at is being a male under 40, which he [i]s.

Another risk factor [is] nonadherence with treatment. He stopped [taking] his medications about a year ago after reporting [that he had] a spiritual experience. He missed his recent psychiatry follow-up appointment in February and has refused all medications here [at MNMC].

Another factor we look at is a history of trauma and witnessing violence in the home, which has been extensive for [Appellant] throughout his life.

Another factor that we look at is access to weapons. He ha[d] three assault style guns as well as 2700 rounds of ammunition and body armor that were purchased recently and are currently in police possession due to a PFA. [Appellant] does note that the body armor was purchased by his mother, [for him to] be safe at the gun range where he was going to practice shooting his gun.

Another factor is a change in the role of a significant other or caretaker who is important to an individual. There is now [a] PFA against [Appellant] from his parents, and typically his mother has been his main support. He lives with his parents. They provide for him financially, and his mother helps get him through school and has, over time, reminded him to attend to his hygiene….

Another risk factor for violence is seeing if an individual sees themselves as a victim. [Appellant] noted that he feels that as a, quote, pure white, end quote, man, he's discriminated against[,] and that history was written by, quote, the allies, end quote. And that white people are targeted unjustly. He has recently made statements that, quote, I have no fear, end quote. In quotes, I have killed my fear, end quote. He also reported to me that he feels like he was being targeted by a peer at church who was talking about him.

Another risk factor for violence is having an aggressive attribution style. This is described as someone who's hostile, suspicious, or believe[s] others intend harm. He has significant paranoia,

including a belief he needs to have a concealed carry permit to protect himself and his, quote, future family, end quote.

He feels very wronged a[fter] learning that his parents used an IVF process to [conceive] h[im] and his sister, and he's made threats, including stating that his parents, quote, are definitely going to pay for this, end quote. And that, quote, we are pure white, not half Arab. These filthy race traitors tried to put a curse on me by naming me Mohammed, end quote.

Another risk factor we look at is command hallucination. [Appellant] reported hearing messages from God to protect his family and build his family, and he's reported this to multiple people, including individuals at church. He's been denying hearing any messages here, but he is noted to often have an incongruent affect, often smiling, even when we're discussing recent troubling events leading to his hospitalization.

Another risk factor for violence is having a psychotic disorder. This can include a delusional disorder as well as … a schizoid or paranoid type, or impulsive, uninhibited type.

Another risk factor for violence is lack of insight into the need for medication, social consequences, or behavior related to the condition. [Appellant] does not believe that trauma, depression, delusion or paranoia could be going on or contributing at all to his recent behavior changes.

He does not think there is any reason individuals might be concerned by his recent behaviors or learning that he had assault weapons and white supremacy items. Nor does he understand why people would be concerned that he texted his mother while making note of security near the Jewish center … when he was walking past [i]t. …

Another risk factor for violence is having suspicion towards others. [Appellant] no longer believes his parents are his parents, feels his identity has all been a lie, no longer believes he may be genetically related to his twin sister, [and] feels an individual at church and at Bible study has been talking about him behind his back.

Another risk factor for violence is if someone appears emotionally cold or numb to others. In discussing recent situations, he shows no affect related to learning that members of the church were afraid of his recent statements and that a member of his Bible

study felt very uncomfortable around him.  Nor does he show any affect related to the PFA and arguments with his parents, even though he is seemingly close with his mother.  [Appellant shows] no affect about the recent loss of his job.  …

[O]ne of the final violence risk factors we look at is if someone has unrealistic plans for the future or anticipated major stress about these situations.  [Appellant] has an upcoming PFA [hearing] and no current housing because he was living with his parents.  He thinks the PFA will be dropped and then he can squat in his parents' home until they can go through the legal process to evict him, which seems not realistic given recent conflict and his reported anger towards them for lying about using IVF[,] and his belief that his father is also lying about [Appellant's] paternity.

He thinks after never having a job except for this fall, part time, which he was only able to keep for one to two months[,] and from which he was fired, that he'll find a job easily and be able to afford a new apartment on his own.  He stated … yesterday that he plans to win the Nobel Peace Prize….

… [Appellant] seems to spend lots of time on Internet forums[,] reading [about] white national militia, Holocaust history revisionists, and supporters of an Aryan race.

*Id.* at 9-18.

In conclusion, Dr. Marden expressed concern for "[p]otential death to others."  *Id.* at 18.  She stated that if the request for extended inpatient treatment was not granted, there would be a "duty to warn" Appellant's parents, his church, and the local Jewish center.  *Id.* at 20; *see also id.* at 24 (Dr. Marden repeating, "if there's … any concern for any potential violence, my understanding … is that you have to warn").

Appellant testified in opposition to the Petition.  He stated he "never threatened anybody."  *Id.* at 31.  However, he admitted to possessing guns which "had been taken in the PFA proceeding."  *Id.* at 33.

Appellant described conflict at his church as a misunderstanding. *Id.* at

31-32. Regarding his concern for his "biological heritage," he testified:

> [M]y parents have admitted that they used donor eggs. They
> contend that they did not use donor sperm, but they will not get
> a paternity test to verify. So I ordered my own DNA heritage test
> from 23andMe. It came in the mail, and I'm ready to take it as
> soon as I'm able to.

*Id.* at 32.

Appellant also stated:

> I have about $16,000 in savings, and for me, I'm physically
> healthier and stronger than I've ever been in my life. I'm ready
> to get another job. I have a new place, a lease signed for a place
> in August, and I'm ready to move forward.

*Id.* at 33. Appellant contradicted some of this testimony when he stated that

consistent with the PFA order, he had not contacted his parents, and was

"ready to stay at a hotel, a homeless shelter, or call a friend or do whatever I

need to do." *Id.* at 34.

Finally, when given the opportunity to address the MHRO, Appellant

stated:

> I would like to say I ma[d]e some sarcastic jokes, some hyperbolic
> jokes during [a] family argument, [and] during other occasions.
> These are not serious beliefs that I'm holding. These are not
> delusions that I'm holding. And furthermore, I never threatened
> anyone or myself. And it's completely against my belief as a
> Christian to hurt anybody or to hurt myself.

*Id.* at 35.

After hearing testimony and argument from counsel, the MHRO stated,

"[b]ased on the testimony, I am going to grant the [P]etition." *Id.* at 38.

That same day, the MHRO filed the Report with factual findings and legal conclusions. *See* Report at 1-3. The MHRO recommended the trial court find Appellant "severely mentally disabled and in need of involuntary treatment." *Id.* at 3. The MHRO specifically recommended that the court commit Appellant "to inpatient treatment at [MNMC] or another designated facility … for a total commitment period not to exceed twenty (20) days." *Id.*

On May 2, 2024, the trial court entered an order stating:

> [Appellant] is in need of inpatient treatment pursuant to Section 303 of the [MHPA] as determined by the [MHRO]. It is hereby ORDERED AND DIRECTED that [Appellant] be committed to inpatient treatment at [MNMC] or other designated facility approved by the treatment team … for a period not to exceed twenty (20) days.

Order, 5/2/24.[5] Appellant filed a petition for review of the order, which the trial court denied. Order, 5/7/24.

Appellant then filed this timely appeal and a court-ordered concise statement of errors pursuant to Pa.R.A.P. 1925(b).[6] In response, the trial court filed a "Rule 1925(a) Opinion" stating that it was relying on Dr. Marden's

---

[5] Evidence presented to the MHRO and summarized by the trial court is sufficient to justify the court's finding that a person is in need of inpatient treatment. *In re Condry*, 450 A.2d 136, 139 (Pa. Super. 1982).

[6] Although the order has expired, the appeal is not moot given the "important liberty interest … at stake in all involuntary commitments[, which,] by their nature, … expire prior to appellate review." *In re R.D.*, 739 A.2d 548, 553 (Pa. Super. 1999); *see also In re J.M.*, 726 A.2d 1041, 1045 n.6 (Pa. 1999) (holding appeals from expired involuntary commitment orders are not moot as issues are capable of repetition and may evade review).

hearing testimony to support the court's decision on appeal. Trial Court Opinion, 6/14/24, at 1.

Appellant presents the following issue for review:

DID THE [TRIAL] COURT ERR IN COMPELLING APPELLANT'S INVOLUNTARY PSYCHIATRIC TREATMENT AS THE GOVERMENT FAILED TO PRESENT IT WITH CLEAR AND CONVINCING EVIDENCE OF CONDUCT SUPPORTING A REASONABLE PROBABILITY THAT DEATH OR SERIOUS BODILY INJURY WERE LIKELY IMMINENT ABSENT THE COMMITMENT?

Appellant's Brief at 4.

*Analysis*

In reviewing Appellant's issue, "we must determine whether there is evidence in the record to justify the court's findings. Although we must accept the trial court's findings of fact that have support in the record, we are not bound by its legal conclusions from those facts." **In re S.O.**, 311 A.3d 1132, 1135 (Pa. Super. 2024) (citation omitted), *appeal denied*, No. 107 WAL 2024 (Pa. Aug. 7, 2024).

The MHPA provides:

Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that **he poses a clear and present danger of harm to others** or to himself….

50 P.S. § 7301(a) (emphasis added).

- 10 -

A "clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm." 50 P.S. § 7301(b)(1). Such proof must be clear and convincing. **See In re Vencil**, 152 A.3d 235, 242 (Pa. 2017). "Our Supreme Court has defined clear and convincing evidence as 'testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.'" **In re S.M.**, 176 A.3d 927, 937 (Pa. Super. 2017) (citations omitted). "[T]he clear and convincing evidence test 'has been described as an "intermediate" test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt.'" **Id.**

Appellant claims the record lacks clear and convincing evidence that his involuntary psychiatric treatment was necessary to avoid a clear and present danger of harm to others. Appellant's Brief at 15-16. He asserts "no evidence was adduced that [he] even made a threat to anyone let alone acted in furtherance of the threat." **Id.** at 16. According to Appellant, "[h]e was put away because he makes people nervous." **Id.** at 15. We disagree.

This Court recently stated:

There is nothing in the [MHPA] stating that the threat must have expressed that an underlying harmful act will promptly occur or denote a specific timeframe for the act to be carried out.

Rather, commitment pursuant to the MHPA may be proper when there is a determination that the individual is "in need of

immediate treatment" based on a threat and act in furtherance of the threat.

*In re S.O.*, 311 A.3d at 1138.

The record supports the finding that Appellant "verbally threatened his parents" and acted in furtherance of the threat by purchasing "3 assault weapons with numerous rounds of ammunition." Report at 2. Dr. Marden testified that Appellant "feels very wronged" because his parents used IVF to conceive him, "and he's made threats, including stating that his parents, quote, are definitely going to pay for this, end quote." N.T. at 13. Dr. Marden also testified that Appellant had "three assault style guns as well as 2700 rounds of ammunition and body armor that were purchased recently." *Id.* at 11.

The facts of *In re Woodside*, 699 A.2d 1293 (Pa. Super. 1997) are similar. The appellant in *Woodside* was involuntarily committed to a hospital for an emergency mental health examination and treatment, after which the hospital successfully petitioned to extend the commitment by 20 days. *Id.* at 1295. We explained:

> This case developed as a result of a petition filed … by [the] appellant's estranged wife, Rachel Woodside, alleging that [the] appellant was in need of involuntary emergency medical evaluation. In support of this petition, Mrs. Woodside … averred that [the] appellant had not been taking his antidepressant medication, had withdrawn from therapy and had engaged in verbally aggressive behavior and fits of rage. … [The a]ppellant … stated to [Mrs. Woodside's friend] that, "I might as well get a rifle with a scope to get rid of the problem. The problem being my soon to be ex-wife." Moreover, according to Mrs. Woodside, … her neighbor had observed [the] appellant shopping in a sporting goods store and, upon checking with the store, Mrs.

Woodside discovered that [the] appellant had purchased a rifle scope.

*Id.* at 1294 (citations omitted).

This Court stated, "there can be no doubt that [the] appellant's statement, as related by [Mrs. Woodside's friend], was a threat of harm directed at Mrs. Woodside." *Id.* at 1297. We further found that the appellant's purchase of a rifle scope, "[c]ombined with the fact that [the] appellant admittedly had a ready supply of rifles on which to mount the scope, … appears to be an overt act in furtherance of the threat." *Id.* Thus, we rejected the appellant's claim that his involuntary commitment "did not meet the statutory requirements for such commitment." *Id.* at 1296. We explained:

> The stakes are simply too high to require, beyond this conduct, a more explicit demonstration of [the] appellant's intention to carry out his threat. Particularly when combined with the petition averments that [the] appellant had quit taking his medication, had quit therapy, and had engaged in "obsessive", "unusual" and "aggressive" behavior, [the] appellant's acts in furtherance of his threat warranted involuntary commitment pursuant to section 7301. This fact was confirmed by the physician's examination conducted within hours of [the] appellant's commitment, which concluded, as noted, that he was "severely mentally disabled and in need of treatment."

*Id.* at 1297.

Like *Woodside*, we discern no error by the trial court in this case, as the record and law support the order extending Appellant's involuntary psychiatric treatment.

Order affirmed.

- 13 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/07/2024