**In re James C. WOODSIDE, Appellant.**

Superior Court of Pennsylvania.

Argued June 18, 1997.

Filed Aug. 28, 1997.

---

Richard A. Mylin, III, York, for appellant.

Before TAMILIA and HUDOCK, JJ. and CERCONE, President Judge Emeritus.

TAMILIA, Judge.

James C. Woodside appeals from the September 16, 1996 Order extending by twenty (20) days his period of involuntary emergency mental health evaluation and treatment pursuant to the Mental Health Procedures Act, 50 P.S. § 7101 et seq.

This case developed as a result of a petition filed on September 3, 1996 by appellant's estranged wife, Rachel Woodside, alleging that appellant was in need of involuntary emergency medical evaluation. In support of this petition, Mrs. Woodside, a mental health therapist, averred that appellant had not been taking his antidepressant medication, had withdrawn from therapy and had engaged in verbally aggressive behavior and fits of rage. She also stated that on August 24, 1996, appellant had appeared at the former marital residence with a handgun strapped to his waist. Finally, Mrs. Woodside stated in the petition that appellant had called her friend, Jeannie Grimes, on September 1, 1996 and stated to Ms. Grimes that, "I might as well get a rifle with a scope to get rid of the problem. The problem being my soon to be ex-wife." (R. 63.) Moreover, according to Mrs. Woodside, on September 3, 1996 (the day the petition was filed), her neighbor had observed appellant shopping in a sporting goods store and, upon checking with the store, Mrs. Woodside discovered that appellant had purchased a rifle scope. Based upon this petition, appellant was involuntarily committed to the York Hospital Emergency Room for emergency mental health evaluation and treatment on September 4, 1996. A subsequent physi-

cian's examination conducted the same day determined that appellant was "severely mentally disabled and in need of treatment." (R. 68.) Another physician's examination conducted on September 6, 1996 concluded that appellant "continues to be severely mentally disabled and in need of treatment." (R. 71.)

Thereafter, on September 10, 1996, a mental health hearing officer conducted proceedings on the hospital's petition to extend appellant's commitment by an additional 20 days. Following the hearing, the hearing officer recommended an additional 20-day inpatient commitment. Unfortunately, a mechanical failure prevented the transcription of testimony from that hearing. Therefore, on September 16, 1996, the trial court conducted another hearing at which the testimony from the September 10th hearing was reconstructed through the notes and recollection of counsel. Appellant, his estranged wife, the mental health hearing officer and a social worker from York Hospital also attended the hearing and contributed to the reconstruction of the record. This record included the testimony of Mrs. Woodside that in the days immediately preceding appellant's commitment, he had made threatening gestures toward her, got "in [her] face" and poked her in the shoulder with his finger (N.T., 9/16/96, p. 4). According to Mrs. Woodside, appellant "was increasingly unpredictable [and] would go into rages, screaming and yelling profanities at her." *Id.* Mrs. Woodside also testified that in the days preceding his commitment, appellant had repeatedly engaged in bizarre behavior, such as buying identical copies of tools and guns and 20 pairs of shoes on one occasion. (N.T. at 7.) Appellant also stopped maintaining his personal hygiene. *Id.* Mrs. Woodside further testified that she cleaned up the motel room in which appellant had been living and found numerous guns, ammunition and handcuffs. (N.T. at 4.) Although she had seen guns over the course of her marriage to appellant, Mrs. Woodside stated that she had "never seen any of these things before." *Id.*

The record also established that Mrs. Woodside had obtained a protection from abuse order against appellant, a hearing for which had not yet been held. (N.T. at 6.) Mrs. Woodside further testified that she found a rifle scope "in the box that looked new" among appellant's possessions after he had been committed (N.T. at 16). Jeannie Grimes testified at the hearing, via telephone, and stated that appellant had called her on September 1, 1996, three days before his commitment, and stated that he was "very angry at his soon-to-be ex-wife" and that he "might as well get a scope and a rifle and get rid of the problem, my soon-to-be-ex-wife." (N.T. at 14.) Based upon the phone call, Ms. Grimes, who had been a friend of the Woodsides for 15 years, "was floored, I was petrified ... I couldn't stand to hear any more. I was so shaken. My first concern was for his wife's safety. Second, I was concerned about his state of mind." (N.T. at 15–16.) After the call, Ms. Grimes contacted Mrs. Woodside to relay appellant's threat.[1] Doctor Bryan Stevens, who had conducted an examination of appellant after his commitment, also testified that appellant had admitted purchasing a rifle scope within 30 days of his commitment, although appellant claimed he would use it for hunting (N.T. at 17–18). Dr. Stevens diagnosed appellant with "adjustment disorder with mixed disturbance of emotions and conduct, probable major depression" and testified that appellant's conduct toward his estranged wife was caused by these illnesses (N.T. at 18). Based involuntary commitment of appellant because he would be likely to repeat his behavior if left untreated (N.T. at 19). Appellant also testified at the hearing and stated that all of his weapons were for hunting, and that he did not threaten or intend to harm his wife in any way (N.T. at 24). As to Mrs. Woodside's allegation that appellant had poked her, he conceded that "I may have emphatically poked her, but no big physical contact." *Id.* He also stated that he carried a pistol to the former marital residence on August 24, 1996, because he did not want to leave it at the motel room in which he was staying (N.T. at

---

1. As noted, this threat was reiterated in Mrs. Woodside's petition to commit appellant.

27). Following the presentation of this testimony, by Order dated September 16, 1996, the trial court directed that appellant's involuntary commitment be extended by 20 days. This appeal followed in which appellant presents two claims.[2]

Appellant first argues that his initial involuntary commitment was improper because the petition filed by his estranged wife did not meet the statutory requirements for such commitment. Appellant also claims the Order of September 16, 1996 extending the commitment for 20 days was illegal because the petition for such an extension was not filed within 120 hours of commitment, as required by statute.[3]

■ Initially, although the issue of mootness has not been raised, we note that this case presents a live controversy despite the fact that appellant's commitment has long since expired. This is so "because involuntary commitment affects an important liberty interest, and because by their nature most involuntary commitment orders expire before appellate review is possible." *Commonwealth v. Blaker,* 293 Pa.Super. 391 n. 1, 446 A.2d 976, 977 n. 1 (1981). "[W]ere we to dismiss such appeals as moot, the challenged procedure could continue yet its propriety would evade our review." *In Re Ann S.,* 279 Pa.Super. 618, 621 n. 2, 421 A.2d 370, 372 n. 2 (1980). Thus, this appeal is properly before us.

■ Turning to the first issue, we note that the propriety of appellant's initial commitment is determined by 50 P.S. § 7301, which provides in relevant part:

§ 7301. **Persons who may be subject to involuntary emergency examination and treatment**

(a) **Persons Subject.**—Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

*Id.,* § 7301(a). The Act further defines those circumstances in which a person presents "a clear and present danger of harm to others or to himself." Since appellant's commitment was not premised on the presentation of any danger to himself, we confine our review to the question of whether appellant was a danger to others. In this regard, section 7301(b) provides in relevant part:

(b) **Determination of Clear and Present Danger.**—

(1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated.... For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

*Id.,* § 7301(b). Here, appellant's commitment was premised on the latter sentence of this section, requiring a threat and "acts in furtherance of the threat."

The threat at issue is appellant's statement to Jeannie Grimes that he "might as well get a scope and a rifle and get rid of the problem, my soon-to-be-ex-wife." (N.T. at 14.) Appellant claims that "[t]his language does not constitute a threat." (Appellant's brief at 12.) Later in his brief he also states that "[t]his statement is [Ms. Grimes'] interpreta-

---

**2.** The solicitor for appellee, the York/Adams Mental Health–Mental Retardation Program has filed a "no interest letter" averring that appellee will not pursue this appeal.

**3.** Although appellant's statement of the issues has four sub-parts, his argument section combines these into the two aforementioned issues.

tion and not a direct threat." (Appellant's brief at 29.) Although it is difficult to tell from these assertions whether appellant admits making the statement related by Ms. Grimes, no where in his brief does he explain what he actually said during his admitted phone call to Ms. Grimes or how it may have been misinterpreted by her. At any rate, the credibility of Ms. Grimes and appellant as to what was actually said was a matter for the trial court and we will not disturb its determination to credit Ms. Grimes' testimony. *Commonwealth v. Marinelli*, Pa. , 547 Pa. 294, 690 A.2d 203 (1997) ("We have often stated that it is the function of the factfinder to pass upon the credibility of witnesses and the weight accorded to the evidence. The factfinder is free to believe all, part or none of the evidence."). Viewing the evidence in this light, there can be no doubt that appellant's statement, as related by Ms. Grimes, was a threat of harm directed at Mrs. Woodside.

Having established the existence of a threat, the only determination remaining under section 7301(b) is whether appellant "committed acts in furtherance of the threat to commit harm." The trial court resolved this issue as follows:

> The question we consider, then, is whether there has been an overt act here which would result in extending the period for inpatient treatment.

> We are frankly not satisfied that the testimony regarding the patient's lack of care for himself rises to the level mandated by the Act, but we find that the statements attributed to husband, which he does not really deny, when coupled with the incidents of carrying and displaying weapons, does constitute an overt act.

(N.T. at 59.)

Although the court found that appellant had received a mail-ordered rifle scope, the court determined as a matter of fact that this did not occur within 30 days of his commitment and, therefore, the court could not consider this purchase as an overt act. 50 P.S. § 7301(b)(1). However, the court made no findings of fact with regard to appellant's alleged purchase of a scope from a sporting goods store on the day of his commitment. In this regard, we reiterate the testimony of Mrs. Woodside that on the day she filed the commitment petition, her neighbor observed appellant shopping in a sporting goods store. Mrs. Woodside then contacted the store and determined that appellant did indeed purchase a rifle scope. This testimony was further supported by the fact that Mrs. Woodside discovered a boxed rifle scope which appeared to be new as she cleaned appellant's motel room. It is highly unlikely that appellant's apparent purchase of a rifle scope two days after he threatened to "get a rifle with a scope to get rid of the problem" was mere coincidence. Combined with the fact that appellant admittedly had a ready supply of rifles on which to mount the scope, the purchase appears to be an overt act in furtherance of the threat in addition to those relied upon by the trial court.

Nonetheless, we agree with the trial court that appellant's habit of carrying and displaying guns in the presence of Mrs. Woodside, which developed within 30 days of his commitment and accompanied aggressive behavior, constitutes an overt act in furtherance of the threat directed at Mrs. Woodside. The stakes are simply too high to require, beyond this conduct, a more explicit demonstration of appellant's intention to carry out his threat. Particularly when combined with the petition averments that appellant had quit taking his medication, had quit therapy, and had engaged in "obsessive", "unusual" and "aggressive" behavior, appellant's acts in furtherance of his threat warranted involuntary commitment pursuant to section 7301. This fact was confirmed by the physician's examination conducted within hours of appellant's commitment, which concluded, as noted, that he was "severely mentally disabled and in need of treatment." (R. 71.) Thus, appellant's first claim fails.

■ Appellant next claims the court's Order of September 16, 1996, which extended his commitment by 20 days, was an abuse of

discretion because the petition for such extension was not filed within 120 hours as required by statute. The statutory provision relied upon by appellant is section 7302(d), which provides in relevant part:

> **§ 7302. Involuntary emergency examination and treatment authorized by a physician—not to exceed one hundred twenty hours**
>
> **(d) Duration of Emergency Examination and Treatment.**—A person who is in treatment pursuant to this section shall be discharged whenever it is determined that he no longer is in need of treatment and in any event within 120 hours, unless within such period:
>
> . . .
>
> (2) a certification for extended involuntary emergency treatment is filed pursuant to section 303 of this act.

*Id.,* § 7302(d) (footnotes omitted; emphasis added).

On September 10, 1996, the certification to extend appellant's involuntary emergency treatment was filed under section 7302(d)(2). Since appellant was committed on September 4th, the filing of this petition, being more than 120 hours later, was clearly untimely.[4] This fact is not contested. In its Order of September 16, 1996, the trial court acknowledged that "the 120 hours expired sometime on Monday, September 9, 1996." (Order, 9/16/96, p. 4.) In addition to the clear mandate of the statute that such certification for involuntary treatment can prevent discharge

only where it is filed "in any event *within 120* hours", we have held that the Mental Health Procedures Act is to be construed strictly. *See e.g., Commonwealth v. Blaker,* 293 Pa.Super. 391, 446 A.2d 976 (1981); *In Re S.C.,* 280 Pa.Super. 539, 421 A.2d 853 (1980) ("[T]he very nature of civil commitment . . . entails an extraordinary deprivation of liberty . . . A statute sanctioning such a drastic curtailment of the rights of citizens must be narrowly, even grudgingly construed, in order to avoid deprivations of liberty without due process of law.") (Citation omitted.)

Bound by this narrow construction, we cannot disregard the clear statutory mandate requiring discharge or the filing of a certification for extended commitment within 120 hours of initial commitment. *See In re J.S.,* 526 Pa. 418, 425–27, 586 A.2d 909, 913 (1991) ("It is clear from the language used in 50 P.S. § 7302 that when an individual is properly admitted to involuntary inpatient treatment, he will be provided with court intervention within 120 hours or less. The language of this statutory provision is unambiguous and admits of no exception to the 120 hour time frame."); *see also In re J.K.,* 407 Pa.Super. 559, 561–63, 595 A.2d 1287, 1289 (1991) ("This court has concluded that where the procedural requirements [of the Act] are not fulfilled the commitment is unlawful.") (citation omitted). Since there is no dispute that this requirement was not met, we are compelled to reverse the September 16, 1996 Order directing appellant's extended involuntary commitment for an additional 20 days.[5]

■ Finally, we must consider appellant's request "that the order of commitment be

---

4. Testimony presented at the September 10, 1996 hearing establishing the exact time of appellant's commitment on September 4th apparently was lost due to the mechanical failure of transcription equipment. Although the majority of that hearing was reconstructed at the hearing of September 16th, the exact time of appellant's commitment was not reestablished. However, regardless of the time, the 120-hour period would have expired at a corresponding time on September 9, 1996.

5. We note the recent Opinion of a panel of this Court in *In re S.L.W.* and *H.I.D.,* 698 A.2d 90 (Pa.Super.1997), in which it was held that a "technical violation" of the 120–hour rule of

section 7302(d)(2) did not warrant vacating a commitment Order and expunging the record of commitment. In *S.L.W.,* however, although the section 7303 certification had not been filed with the mental health facility within 120 hours, it had been filed with the prothonotary within 120 hours. On these facts, the court found as follows: "Even if we were to interpret the Act as requiring the filing of the § 303 certification with the facility, as opposed to the court, within five days, we would not be convinced that such a minor breach of the Act's provisions requires us to vacate S.L.W.'s order of commitment." *Id.,* 698 A.2d at 92–93. By contrast, section 7303 certification in the instant case was not merely filed in the wrong place; it was not filed at all

expunged and suppressed, and that all court and hospital records documenting the commitment be destroyed." (Appellant's brief at 35.) Having found that the initial commitment was proper, we decline to order expungment of the records relating to that event. We are simply unwilling to deem the otherwise proper initial commitment void merely because a subsequent extension of that commitment was improperly sought and granted.[6] However, since we have found that the extension was improperly granted, we hereby order expungment of all records and documents generated during or referring to any period after September 9, 1996, the date on which appellant should have been discharged pursuant to section 7302(d).

Order reversed; case remanded.

Jurisdiction relinquished.

within 120 hours. Thus, far from a "technical violation", this case involved a substantive disregard of the express mandate of section 7302(d). For this reason, *S.L.W.* is distinguishable.

Finally, *In re H.I.D.*, an appeal consolidated with *S.L.W.*, does not consider the 120-hour requirement of section 7302(d).

6. In this regard, we note the recent decision in *In re Chiumento*, 455 Pa.Super. 376, 688 A.2d 217 (1997), in which a panel of this Court found a violation of the 120-hour rule of section 7302(d) and "remand[ed] with directions to the trial court to expunge any and all record of the appellant's involuntary civil commitment." *Id.* at 383–84, 688 A.2d at 221. However, the *Chiumento* Court made no finding as to the propriety of appellant's initial commitment and, in light of the Order directing expungment of "any and all record" of commitment, we are left to assume that the initial commitment was improper. Since we have made an express finding that appellant's initial commitment was warranted, *Chiumento* is distinguishable.