J-S15032-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INT. OF: C.L.A | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: C.L.A. | |
| | No. 1745 MDA 2014 |

Appeal from the Order Entered October 8, 2014
In the Court of Common Pleas of Centre County
Civil Division at No(s): 2001-1717

BEFORE:  LAZARUS, J., WECHT, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                    **FILED MARCH 11, 2015**

Appellant C.L.A. appeals from an order of the Centre County Court of Common Pleas ordering that Appellant be committed to inpatient treatment pursuant to the Mental Health Procedures Act, 50 P.S. §§ 7101, *et seq.*, for a period not to exceed 90 days.  We affirm.

On September 11, 2014, the Centre County Mental Health and Intellectual Disabilities office ("MH/ID") filed an application for involuntary emergency examination and treatment of Appellant pursuant to 50 P.S. § 7302.[1]  Appellant was committed to Mount Nittany Medical Center for a period of not more than five days.

---

[1]  50 P.S. § 7302 provides:

> **(a) Application for Examination.**--Emergency examination may be undertaken at a treatment facility

*(Footnote Continued Next Page)*

On September 15, 2004, MH/ID filed a petition for extended involuntary treatment of Appellant pursuant to 50 P.S. § 7303 ("section 303").[2]  On September 16, 2014, the mental health review officer held a section 303 hearing and recommended that the trial court find Appellant severely mentally disabled and in need of involuntary treatment and recommended that the trial court order that Appellant be committed to inpatient treatment for a total commitment period not to exceed 20 days. Report of Mental Health Review Officer, 9/16/2014, at 1, 3.  On September 18, 2014, the trial court ordered Appellant's commitment to inpatient treatment at Mount Nittany Medical Center or other designated facility

_(Footnote Continued)_ ————————————

upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination.

[2] 50 P.S. § 7303 provides:

**(a) Persons Subject to Extended Involuntary Emergency Treatment.**--Application for extended involuntary emergency treatment may be made for any person who is being treated pursuant to section 302 whenever the facility determines that the need for emergency treatment is likely to extend beyond 120 hours. The application shall be filed forthwith in the court of common pleas, and shall state the grounds on which extended emergency treatment is believed to be necessary. The application shall state the name of any examining physician and the substance of his opinion regarding the mental condition of the person.

approved by his team and Centre County MH/ID for a period not to exceed twenty (20) days.

On September 18, 2014, Appellant filed a petition for review of certification to involuntary inpatient mental health treatment, which the trial court denied on September 19, 2014.

On October 3, 2014, MH/ID filed a petition for extended involuntary treatment of Appellant pursuant to 50 P.S. § 7304 ("section 304"). On October 6, 2014, a mental health review officer held a section 304 hearing.

Lynette Turay, M.D., a board certified psychiatrist and Appellant's treating psychiatrist, testified. N.T., 10/6/2014, at 6-7. Dr. Turay examined Appellant and diagnosed him with chronic paranoid schizophrenia and substance abuse disorder. *Id.* at 7-8. Dr. Turay also reviewed Appellant's treatment records and relied on the information contained therein for her treatment and diagnosis of Appellant. *Id.* at 7, 11.

Dr. Turay testified, to a reasonable degree of psychiatric certainty, that Appellant was currently unable to provide for his basic needs without care and assistance of others and that death or serious debilitation would be likely within 30 days if he was not treated. N.T., 10/6/2014, at 8. She also stated Appellant had a history of failing to take his medications and seeking other medications that were not appropriate for treatment of chronic paranoid schizophrenia. *Id.* at 8-9. Dr. Turay stated that Appellant did not believe he suffered from chronic paranoid schizophrenia, felt the recommended treatment was inappropriate for him, and had paranoia

regarding the hospital staff, who he felt were trying to cause him trouble or concern. *Id.*

Dr. Turay testified Appellant refused to talk with her and others about his medications, refused to participate in routine medical observation and care, and refused to sit down and reason through with the treating staff about his failure to participate in treatment. N.T., 10/6/2014, at 13-14. Over Appellant's objection, Dr. Turay testified, based on hospital records, that Appellant had increasing delusions of chips being placed in him and being tortured and that he heard voices telling him that the workers at Strawberry Fields, where he resided, were in a conspiracy and attempting to kill him. *Id.* at 16. Further, over Appellant's continued objections, Dr. Turay testified that Appellant told a medical student that he intended to seek out a professor in Israel to assist him in manufacturing and distributing a "chemical for a nicotine free base and methanol" and that Appellant acknowledged to medical staff that he had voices in his head that stopped at 8:15 on October 2nd. **Id.** at 12, 18.

Dr. Turay opined that, if released, Appellant would return to his pattern of non-compliance and seek controlled substances that are not recommended. N.T., 10/6/2014, at 19-20. She further opined that inpatient treatment was the least restrictive form of treatment, and was required to prevent Appellant from harming himself. *Id.* at 19.

The Mental Health Review Officer, who presided over the section 304 hearing, recommended that the trial court find Appellant severely disabled

and in need of treatment and recommended that the trial court order Appellant be committed to inpatient treatment at the Mount Nittany Medical Center with subsequent transfer to Danville State Hospital or other designated facility approved by his treatment team and Centre County MD/ID for a total commitment period not to exceed 90 days. Report of Mental Health Review Officer, 10/6/2014, at 1, 3. On October 8, 2014, the trial court ordered that Appellant be committed to inpatient treatment for a total commitment period not to exceed 90 days. Order, 10/8/2014.

On October 10, 2014, Appellant filed a petition for review of certification to involuntary inpatient mental health treatment. That same day, the trial court affirmed the decision and ordered that Appellant remain in involuntary inpatient psychiatric treatment for a period not to exceed 90 days.

On October 14, 2014, Appellant filed a timely notice of appeal. Both Appellant and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.[3]

_____

[3] Although the period of commitment has expired, this appeal is not moot. **In re Woodside**, 699 A.2d 1293, 1296 (Pa.Super.1997). Involuntary commitment:

> affects an important liberty interest, and . . . by their nature most involuntary commitment orders expire before appellate review is possible. [W]ere we to dismiss such appeals as moot, the challenged procedure could continue yet its propriety would evade our review.

*(Footnote Continued Next Page)*

Appellant raises the following issues:

> I. Whether the hearing examiner committed reversible error by overruling Appellant's timely hearsay objections to the testimony of the state's expert witness relating to overt acts supporting her opinion that Appellant was a danger to himself or others?
>
> II. Whether the state failed to present competent and admissible evidence of the overt facts underlying its expert's opinion that death or serious physical debilitation or bodily injury were likely imminent if Appellant were not forced to undergo involuntary psychiatric treatment?

Appellant's Brief at 5.

Appellant first contends the trial court erred when it permitted the expert, Dr. Turay, to testify regarding statements made by Appellant to a medical student and to medical staff. Appellant's Brief at 11-15. Appellent claims these statements constitute inadmissible hearsay. *Id.*

"The admissibility of evidence is a matter addressed solely to the discretion of the trial court and may be reversed only upon a showing that the court abused its discretion." ***Klein v. Aronchick***, 85 A.3d 487, 491 (Pa.Super.2014) (quoting ***Commonwealth v. Marshall***, 743 A.2d 489, 492 (Pa.Super.1999)). We reverse an evidentiary ruling only if it is erroneous and "harmful or prejudicial to the complaining party." *Id.* (quoting ***McManamon v. Washko***, 906 A.2d 1259, 1268–1269 (Pa.Super.2006)).

*(Footnote Continued)* ─────────────

*Id.* (internal citations and quotation marks omitted).

Appellant relies on **In re Hutchinson** to support his inadmissible hearsay claim. In **In re Hutchinson**, the Supreme Court of Pennsylvania found counsel was ineffective at a section 304 hearing for not objecting to testimony of the examining psychiatrist, who relayed statements contained on the commitment forms and a statement the patient's grandmother made during a telephone conversation claiming the patient assaulted the grandmother with a gun. 454 A.2d 1008, 1011 (Pa.1982). The Court found the statements were hearsay because they were the grandmother's out-of-court statements and were offered to prove the appellee committed the assault. **Id.** The Court found counsel "had no reasonable basis for failing to object." **Id.**

Here, the trial court properly admitted the statements, which were the foundation for Dr. Turay's expert testimony. Pennsylvania Rule of Evidence 703 provides: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." This Court has stated:

> It is well-established that an expert may express an opinion which is based on material not in evidence . . . where such material is of a type customarily relied on by experts in his or her profession. Such material may be disclosed at trial even though it might otherwise be hearsay . . . . Such hearsay is admissible because the expert's reliance on the material provides its own indication of the material's trustworthiness: "The fact that experts reasonably and regularly rely on this type of

> information merely to practice their profession lends strong indicia of reliability to source material, when it is presented through a qualified expert's eyes.

*In re D.Y.*, 34 A.3d 177, 182 (Pa.Super.2011) (quoting *Boucher v. Pa. Hosp.,* 831 A.2d 623, 628 (Pa.Super.2003)) (internal citation omitted).

Unlike the expert in *Hutchinson*, Dr. Turay testified that she relied on information provided by other medical staff and that members of her profession rely on such information. N.T., 10/6/2014, at 10-12. Accordingly, the medical health examiner acted within her discretion in admitting the statements and the trial court acted within its discretion when relying on the statements. *See, e.g., In re D.Y.*, 34 A.3d at 183 (expert permitted to testify as to name and fingerprints on ten print card even though the testimony was hearsay because fingerprint experts reasonably rely on ten print cards).

Appellant next contends MH/ID presented insufficient evidence of overt acts underlying Dr. Turay's opinion that death or serious physical debilitation or bodily injury were likely imminent if Appellant were not forced to undergo involuntary psychiatric treatment. Appellant's Brief at 16-20. We disagree.

This Court reviews determinations pursuant to the Mental Health Procedures Act to "determine whether there is evidence in the record to justify the hearing court's findings." *In re T.T.*, 875 A.2d 1123, 1126 (Pa.Super.2005) (citing *Com. ex rel. Gibson v. DiGiacinto*, 439 A.2d 105, 107 (Pa.1981)). Although "we must accept the trial court's findings of fact

that have support in the record, we are not bound by its legal conclusions from those facts." **Id.** (citing **Gibson**, 439 A.2d at 107).

Section 304(a) provides:

> **(a) Persons for Whom Application May be Made.**--(1) A person who is severely mentally disabled and in need of treatment, as defined in section 301(a), may be made subject to court-ordered involuntary treatment upon a determination of clear and present danger under section 301(b)(1) (serious bodily harm to others), or section 301(b)(2)(i) (inability to care for himself, creating a danger of death or serious harm to himself), or 301(b)(2)(ii) (attempted suicide), or 301(b)(2)(iii) (self-mutilation).
>
> (2) Where a petition is filed for a person already subject to involuntary treatment, it shall be sufficient to represent, and upon hearing to reestablish, that the conduct originally required by section 301 in fact occurred, and that his condition continues to evidence a clear and present danger to himself or others. *In such event, it shall not be necessary to show the reoccurrence of dangerous conduct, either harmful or debilitating, within the past 30 days.*

50 P.S. § 7304(a). Section 301(a) provides:

> Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

50 P.S. § 7301(a). Section 301(b) defines clear and present danger as follows:

> (b) **Determination of Clear and Present Danger.**--(1) Clear and present danger to others shall be shown by

establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. . . . For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or

(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

50 P.S. § 7301(b).

In a section 304 hearing, the petitioner does not need to establish dangerous conduct recurred within the past 30 days. 50 P.S. § 7304(b); *Commonwealth v. Romett*, 538 A.2d 1339, 1341-42 (Pa.Super.1988).

Rather, the petitioner must establish that the patient's condition continues to evidence a clear and present danger to himself or others. 50 P.S. § 7304(a).

In *Romett*, this Court addressed the provision requiring that upon recommitment it "shall be sufficient to represent, and upon hearing to reestablish, that the conduct originally required, . . . in fact occurred." *Romett*, 538 A.2d at 1342. The Court found the provision does not require that the grounds for original commitment be relitigated. It reasoned that section 304 "is satisfied as long as the patient's commitment history shows that the requisite behavior occurred in the past, unless on recommitment the patient affirmatively challenges the original commitment. In that event, the burden is on the patient to show that the original commitment was improper." *Id.*

The trial court noted Dr. Turay, Appellant's treating psychiatrist, testified that although Appellant was uncooperative, she treated him to the extent he allowed it. Trial Court Opinion, 11/26/2014, at 2. He was diagnosed with chronic paranoid schizophrenia and substance abuse disorder and he was paranoid, psychotic, and delusional. *Id.* Appellant had a history of failing to take his required medications upon discharge from the hospital and a history of seeking medications that were not appropriate. *Id.* Dr. Turay testified that Appellant was unable to provide for his basic needs, including health, safety, welfare, and nutrition, without the assistance of others and there was high risk of death, disability, or serious physical

debilitation. *Id.* She stated Appellant required inpatient treatment, which was the least restrictive means of treatment that would prevent him from harming himself or others. *Id.*

The evidence presented, including Dr. Turay's testimony, supports the trial court's 90-day commitment order. Although on appeal Appellant maintains MH/ID failed to support his original commitment, he did not affirmatively challenge his original commitment at the hearing. Appellant's Brief at 19; N.T., 10/6/2014. Further, his petition for review of the section 304 determination merely asserts that the Commonwealth "presented no competent and admissible evidence of the overt facts underlying Dr. Turay's expert opinion that death or serious physical debilitation or bodily injury were likely imminent if [Appellant] were not forced to undergo treatment." Petition for Review of Certification to Involuntary Inpatient Mental Health Treatment at ¶ 14. Because Appellant did not contest his original commitment, MH/ID was not required at the 304 hearing to establish that the conduct underlying the original commitment occurred.[4] *See Romett*, 538 A.2d at 1342.

_____

[4] Further, the record justifies Appellant's original commitment. The original application asserted that Appellant had previously stated that he would like to end his life by taking cyanide and that he knew how to purchase it on the internet. Application for Involuntary Emergency Examination and Treatment, 9/11/2014. On September 11, 2014, the date the application was filed, Appellant had nitric acid in his room and had an unopened box from Apollo Scientific Limited Unit, which sold chemical-based products. *Id.* The original application includes letters Appellant wrote to the State College

*(Footnote Continued Next Page)*

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>3/11/2015</u>

---

*(Footnote Continued)* ───────────────

Police Department, including a September 8, 2014 letter in which he wrote he had been "tortured day and night with voices, noise and lack of sleep," he is a "wreck," he "just can't function anymore and . . . see[s] no hope for the future." Letter Dated Sept. 8, 2014 from C.L.A. to State College Police Department, attached to Application for Involuntary Emergency Examination and Treatment, 9/11/2014. He wrote of hearing voices, being in pain, and having a "chip near each ear." *Id.* The September 8, 2014 letter stated: "This has been going on for more than 10 years. I have lost my life to this and suffered greatly. I have suffered from constant death threats. I just can't live like this." *Id.* The letter also claimed the workers at Strawberry Fields, where Appellant resided, were in a conspiracy with the government. *Id.*