J-A11041-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1677 MDA 2018 |

Appeal from the Order Entered September 6, 2018
In the Court of Common Pleas of Centre County
Civil Division at No.: 17-0031

BEFORE:  BOWES, J., OLSON, J., and STABILE, J.

MEMORANDUM BY STABILE, J.:                    **FILED JULY 17, 2019**

Appellant K.M. appeals from the September 6, 2018 order of the Court of Common Pleas of Centre County ("trial court"), which denied his petition for expungement of records relating to his involuntary commitment under Section 7302 of the Mental Health Procedures Act ("MHPA"), 50 P.S. § 7302 ("Section 302"). Upon review, we reverse and remand.

Following Appellant's threats of suicide while visiting a clinic in Spring Mills, Pennsylvania, for blood tests on July 29, 2016, the clinic's medical staff submitted an application for involuntary emergency examination and treatment under Section 302, claiming that Appellant posed a clear and present danger to himself and others.  In support, Elizabeth Melville ("Melville") and Carol-Musick-Meyer ("Meyer") provided a description of their encounter with Appellant.  Melville stated:

[Appellant] came into the office on July 29, 2016 to have his blood drawn. I greeted him, asked him his date of birth and name. Proceeded to ask him which doctor it was for, he said 'I guess its that one.' I went through his information and said 'I have your sister as your emergency contact?' He scoffed, so I asked if he would like to change it. He responded with 'I'm not going to live long enough for it to matter anyway.' I wasn't sure what to say so I continued. When we got the insurance I asked if he has insurance and he said 'no.' He also said that he has a $28,000 bill from 2 days in the hospital. He said the only reason he was here today was to get his license back so he could leave the country. They had to check his medication to get the license back. "The medication make me angry, aggressive, violent, homicidal and suicidal.["] I called the phlebotomist and informed her to make sure she had someone with her.

He seemed to be jumpy and wouldn't meet my eyes. At the end I had him sign to let us bill him. He asked what the total would be and I told him I couldn't even speculate. He said 'that's fine, when it's too much I'll end my life.'

Reproduced Record (R.R.) at 22a-23a (sic). Meyer stated:

[Appellant] came in 7-29-16 for lab work, was upset about the bill he owned [sic] with Mount Nittany Medical Center [("MNMC")]. Then said he could take a 350 mag to his head and pull the trigger & kill people with no care. Said I would see him at the courthouse in front of Judge Grine for killing people, and when they ask him why just wanted to do it.

*Id.* at 24a (sic). Based upon the foregoing statements, the County Mental Health Administrator signed a warrant (the "Warrant") directing that Appellant "be taken and examined" at MNMC and, if required, "be admitted to a facility designated for treatment for a period of time not to exceed 120 hours." *Id.* at 26a.

Appellant returned to his sister's house from the clinic. Shortly thereafter, the police arrived with the Warrant and transported him to MNMC, where Appellant was apprised of his rights and presented with the opportunity to commit himself voluntarily. Appellant refused because his request to review the paperwork with an attorney prior to signing was denied. Appellant

- 2 -

eventually was examined by a physician, who noted that he "[s]poke with [Appellant] and reviewed [the] petition. [Appellant] says he will cooperate, is however unwilling to sign [Section] 201[1] despite documented statements indicating thoughts of his own death. Unclear if seizure medications are playing a role in his thought pattern." *Id.* at 28a. In terms of treatment, the physician opined that the "[o]nly safe option is to uphold [Section] 302 to confirm he gets the psych care he needs." *Id.* Thus, the physician opined that Appellant "is severely mentally disabled and in need of treatment," necessitating his admission to "a facility designated by the County Administrator for a period of treatment not to exceed 120 hours." *Id.*

On August 30, 2017, Appellant petitioned the trial court for expungement of his mental health records under Section 6111.1(g)(2) of the Pennsylvania Uniform Firearms Act of 1995 ("UFA"), 18 Pa.C.S.A. § 6111.1(g)(2). On January 29, 2018, Appellant filed an amended petition, alleging that the evidence underlying his Section 302 commitment was insufficient. The Pennsylvania State Police ("PSP") filed an answer on March 19, 2018.

On July 24, 2018, the trial court conducted a hearing, at which Appellant provided extensive testimony. PSP and MNMC did not present any witness

---

[1] Under Section 201, "[a]ny person 14 years of age or over who believes that he is in need of treatment and substantially understands the nature of voluntary treatment may submit himself to examination and treatment under this act, provided that the decision to do so is made voluntarily." 50 P.S. § 7201.

- 3 -

testimony.[2] The trial court directed the parties to submit post-hearing briefs. On August 23, 2018, PSP filed its brief, admitting candidly that "the record in this case does not reflect that [Appellant] appears to have taken a substantial step in furtherance of his expressed suicidal ideation, nor is any such information available to PSP." *Id.* at 48a. As a result, PSP deferred to the trial court to determine whether Appellant's July 29, 2016 Section 302 commitment was supported by sufficient evidence. On August 23, 2018, Appellant filed his own post-hearing brief, arguing, among other things, that his involuntary commitment under Section 302 lacked sufficient evidence given the absence of any allegation of an act in furtherance of his alleged suicidal ideation. *Id.* at 66a. On August 24, 2018, MNMC submitted its brief, asserting that it did not oppose the expungement of Appellant's records relating to his Section 302 commitment. *Id.* at 79a. MNMC, however, opposed the destruction or expunction of such records in its possession. On September 6, 2018, the trial court denied Appellant's expungement petition. Appellant timely appealed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant raises a single issue for our review.

---

[2] As more fully explained below, the trial court does not possess a *de novo* standard of review in Section 302 expungement cases and, as a result, it did not need to hold an evidentiary hearing here because all information elicited at the hearing was irrelevant for purposes of a sufficiency review under Section 6111.1(g)(2). *See In re Vencil*, 152 A.3d 235 (Pa. 2017), *cert. denied*, 137 S. Ct. 2298 (2017). The trial court, as well as this Court on appeal, is obligated to consider only evidence that was known by the physician at the time of the Section 302 commitment.

[I.] Did the trial court commit an error of law and abuse of discretion in ruling that the committing physician had, at the time of the physician's certification of [Appellant's] Section 302 involuntary mental health commitment, sufficient evidence to show by a preponderance of the evidence that [Appellant] posed a clear and present danger to himself or others where no information was presented to the physician, or contained in the physician's findings, relating to any act in furtherance of any threat to commit suicide, or relating to any act in furtherance of any threat to harm another, as required by 50 P.S. § 7301(b)(1), 50 P.S. § 7301(b)(2)(ii), and the Pennsylvania Supreme Court's decision in [*Vencil*]?

Appellant's Brief at 4 (sic).

It is settled that we review the trial court's denial of a motion for expunction for an abuse of its discretion. *Commonwealth v. Smerconish*, 112 A.3d 1260, 1263 (Pa. Super. 2015) (citations omitted). However, questions of evidentiary sufficiency "present pure questions of law, over which our standard of review is *de novo* and our scope of review is plenary." *Vencil*, 152 A.3d at 241.

Here, Appellant essentially argues that, under Section 6111.1(g)(2) of the UFA, the evidence is insufficient to sustain his Section 302 commitment because he did not act in furtherance of any threat to harm himself or others. Under the circumstances of this case, we agree.

Section 6111.1(g)(2) provides:

A person who is involuntarily committed pursuant to section 302 of the [MHPA] may petition the court to review the sufficiency of the evidence **upon which the commitment was based**. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, **the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged**.[3] A petition filed

---

[3] Whenever an individual is involuntarily committed under Section 302, a judge on the courts of common pleas, a mental health review officer, or a

- 5 -

under this subsection shall toll the 60-day period set forth under section 6105(a)(2).

18 Pa.C.S.A. § 6111.1(g)(2) (footnote omitted) (emphasis added).

"A sufficiency review pursuant to section 6111.1(g)(2) of the UFA is merely a mechanism to expunge the PSP's record of an individual's Section 302 commitment to remove" the firearms disqualification. *Vencil*, 152 A.3d at 245. Accordingly, a Section 6111.1(g)(2) expungement petition does not garner a trial *de novo*; rather, the only evidence the court needs to consider is that which was "known by the physician at the time [of the commitment], as contained in the contemporaneously-created record." *Id.* at 242. In fact, the High Court explained: "[d]eference to the facts as found by the original factfinder[, *i.e.*, the physician,] is of particular importance in circumstances where the factfinders have specialized training or knowledge that makes them uniquely qualified to reach the findings and conclusions the General Assembly has entrusted them to make." *Id.* at 243. Moreover, "Section 6111.1(g)(2) does not . . . authorize a trial court to 'redecide the case,' operating as a 'substitute' for the physician who originally decided the 302 commitment was medically necessary." *Id.* at 244 (citations omitted). The Court, therefore, concluded that, under Section 6111.1(g)(2), courts of common pleas must review "only the sufficiency of the evidence to support the [Section 302] commitment, **limited to the information available to the physician at the time**" of the commitment recommendation, "viewed in the light most

_____

county mental health administrator must notify the PSP within seven days of the individual's commitment. *See* 50 P.S. § 7109(d).

- 6 -

favorable to the physician as the original decision-maker to determine whether his or her findings are supported by a preponderance of the evidence." *Id.* at 237 (emphasis added).

"[I]nvoluntary civil commitment[s] of mentally ill persons constitute[] deprivation of liberty and may be accomplished only in accordance with due process protections." *In re Hutchinson*, 454 A.2d 1008, 1010 (Pa. 1982); *In re Chiumento*, 688 A.2d 217, 220 (Pa. Super. 1997). "The very nature of civil commitment . . . entails an extraordinary deprivation of liberty. . . . A statute sanctioning such a drastic curtailment of the rights of citizens must be narrowly, even grudgingly construed, in order to avoid deprivations of liberty without due process of law." *In re Woodside*, 699 A.2d 1293, 1298 (Pa. Super. 1997) (quoting *In Re S.C.*, 421 A.2d 853, 857 (Pa. Super. 1980)).

Section 301, relating to persons who may be subject to involuntary emergency examination and treatment, provides in relevant part:

> **(a) Persons Subject.**--Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses *a clear and present danger of harm to others or to himself*, as defined in subsection (b), or the person is determined to be in need of assisted outpatient treatment as defined in subsection (c).
>
> **(b) Determination of Clear and Present Danger.**--(1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. If, however, the person has been found incompetent to be tried or has been acquitted by reason of lack of criminal responsibility on charges arising from conduct involving infliction of or attempt to inflict substantial bodily harm on another, such 30-day limitation

- 7 -

shall not apply so long as an application for examination and treatment is filed within 30 days after the date of such determination or verdict. In such case, a clear and present danger to others may be shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated. For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person **_has made threats of harm and has committed acts in furtherance of the threat to commit harm_**.

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person **_has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide_**; or

(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

50 P.S. § 7301(a), (b) (emphasis added). In short, to find that an individual presents a clear and present danger either to himself or others, the evidence must demonstrate that the individual's threats to commit harm were accompanied by an act in furtherance of the threat to commit harm. Section 302 provides for emergency examination of persons, which

may be undertaken at a treatment facility upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such

examination; or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination.

50 P.S. § 7302(a). Under Section 302(b), a physician must examine the person "within two hours of arrival . . . to determine if the person is severely mentally disabled within the meaning of section 301(b) and in need of immediate treatment." *Id.* at § 7302(b) (internal footnote omitted). If the physician so finds, then "treatment shall be begun immediately." *Id.* If not, then "the person shall be discharged and returned to such place as he may reasonably direct." *Id.* Section 302 allows a person to be committed up to 120 hours. *Id.* at § 7302(d).

Instantly, based on our review of the record, in particular the information available to the physician at the time of Appellant's Section 302 commitment, we conclude that the evidence was insufficient to support Appellant's Section 302 commitment. Specifically, we agree with Appellant's argument that the record is bereft of any evidence that he acted in furtherance of his threat to harm others or commit suicide. The record reveals only that Appellant, at most, made certain statements at the clinic that led the clinic's staff to believe that he was harboring suicidal ideations. Thereafter, Appellant returned to his sister's home where the police eventually confronted him. Although Appellant admitted at the hearing to storing firearms in the shed outside of the house, the record does not reveal that the police or the physician were aware of Appellant's ownership or possession of firearms prior to or at the time of the Section 302 commitment on July 29, 2016. The record

also does not reveal that the police recovered any weapons, let alone firearms, when they searched Appellant's person prior to transporting him to MNMC. Simply put, besides examples of threatening thoughts and statements, the record contains no evidence of any act undertaken by Appellant in furtherance of his threat to harm himself or others. **See e.g., Vencil**, 152 A.3d at 239 (noting an act in furtherance of suicidal ideations was established when the committee "fled the hospital 'in an emotionally distraught state, and drove in an erratic and dangerous fashion with her headlamps off . . . at risk for striking another motor vehicle, causing a traffic accident.'"); **Smerconish**, 112 A.3d at 1264 (noting that the appellant's internet research seeking painless methods of committing suicide constituted an act in furtherance of the threat to commit harm); **In re R.D.**, 739 A.2d 548, 555 (Pa. Super. 1999) (noting that an elderly woman's act of picking up her cane in an effort to hit another, together with verbal threats of harm, constituted an "act in furtherance of the threat to commit harm" under Section 301); **Woodside**, 699 A.2d at 1297 (noting the man's purchase of a rifle scope from a sporting goods store on the day of his commitment constituted an overt act in furtherance of the threat to harm his estranged wife). Accordingly, we must conclude that all records of Appellant's Section 302 commitment must be expunged and destroyed.[4]

---

[4] To the extent MNMC invites us to permit it to retain and maintain records of Appellant's Section 302 commitment despite our finding that the commitment was not supported by sufficient evidence, we decline the invitation. As our Supreme Court aptly explained in **Vencil**:

> [S]ection 6111.1(g)(2) pertains only to expungement of the PSP's records of an individual's [Section 302] commitment. In the event

Order reversed.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>07/17/2019</u>

---

of a finding that the evidence was insufficient to support the commitment, then the [Section] 302 commitment was unlawful, and destruction of the hospital record of the commitment is mandatory. **See Wolfe v. Beal**, 384 A.2d 1187, 1189 (Pa. 1978) (holding that "a person who has been unlawfully committed to a state mental hospital has a right to the destruction of the hospital records which were created as a result of the illegal commitment").

**Vencil**, 152 A.3d at 240, n.5.  Accordingly, given our conclusion above that Appellant's Section 302 commitment was unlawful because it lacked sufficient evidence, we conclude that all records of such commitment, whether in the possession of PSP, MNMC or any other relevant entity, must be expunged and destroyed.